SWITCHMEN'S UNION OF NORTH AMERICA ET AL.
*v.* NATIONAL MEDIATION BOARD ET AL.

No. 48.   Argued October 15, 1943.—Decided November 22, 1943.

*Mr. Donald R. Richberg,* with whom *Mr. Rufus G. Poole* was on the brief, for petitioners.

*Mr. Robert L. Stern,* with whom *Solicitor General Fahy* was on the brief, for the National Mediation Board et al.; and *Mr. Bernard M. Savage,* with whom *Mr. Alfred L. Bennett* was on the brief, for the Brotherhood of Railroad Trainmen,—respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is an action by the petitioners, the Switchmen's Union of North America and some of its members against the National Mediation Board, its members, the Brotherhood of Railroad Trainmen, and the New York Central Railroad Company and the Michigan Central Railroad Company. The individual plaintiffs are members and officials of the Switchmen's Union and employees of the respondent carriers.

Petitioners were plaintiffs in the District Court. A certification of representatives for collective bargaining under § 2, Ninth of the Railway Labor Act (44 Stat. 577, 48 Stat. 1185) was made by the Board to the carriers.[1]

[1] Sec. 2, Ninth provides: "If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this Act, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such

This certification followed the invocation of the services of the Board to investigate a dispute among the yardmen as to their representative. The Brotherhood sought to be the representative for all the yardmen of the rail lines operated by the New York Central system. The Switchmen contended that yardmen of certain designated parts of the system should be permitted to vote for separate representatives instead of being compelled to take part in a system-wide election.

The Board designated all yardmen of the carriers as participants in the election. The election was held and the Brotherhood was chosen as the representative. Upon the certification of the result to the carriers, petitioners sought to have the determination by the Board of the participants and the certification of the representative cancelled. This suit for cancellation was brought in the District Court. That court upheld the decision of the Board to the effect that all yardmen in the service of a carrier should select a single representative for collective bargaining. The Circuit Court of Appeals affirmed by a divided vote. 135 F. 2d 785. The case is here on a petition for a writ of cer-

---

certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph."

tiorari which we granted because of the importance of the problems which are raised.

We do not reach the merits of the controversy. For we are of the opinion that the District Court did not have the power to review the action of the National Mediation Board in issuing the certificate.

Sec. 24 (8) of the Judicial Code, 28 U. S. C. § 41 (8), gives the federal district courts "original jurisdiction" of all "suits and proceedings arising under any law regulating commerce." We may assume that if any judicial review of the certificate of the Board could be had, the District Court would have jurisdiction by reason of that provision of the Judicial Code. See *Louisville & Nashville R. Co.* v. *Rice*, 247 U. S. 201; *Mulford* v. *Smith*, 307 U. S. 38; *Peyton* v. *Railway Express Agency*, 316 U. S. 350. But we do not think that that broad grant of general jurisdiction may be invoked in face of the special circumstances which obtain here.

If the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control. That was the purport of the decisions of this Court in *Texas & New Orleans R. Co.* v. *Brotherhood of Clerks*, 281 U. S. 548, and *Virginian Ry. Co.* v. *System Federation*, 300 U. S. 515. In those cases it was apparent that but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act. The result would have been that the "right" of collective bargaining was unsupported by any legal sanction. That would have robbed the Act of its vitality and thwarted its purpose. Such considerations are not applicable here. The Act in § 2, Fourth writes into law the "right" of the "majority of any craft or class of employees" to "determine who shall be

the representative of the craft or class for the purposes of this Act." That "right" is protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it and as an incident thereto to determine what is the appropriate craft or class in which the election should be held. See *Brotherhood of Railroad Trainmen* v. *National Mediation Board*, 88 F. 2d 757; *Brotherhood of Railroad Trainmen* v. *National Mediation Board*, 135 F. 2d 780. A review by the federal district courts of the Board's determination is not necessary to preserve or protect that "right." Congress for reasons of its own decided upon the method for the protection of the "right" which it created. It selected the precise machinery and fashioned the tool which it deemed suited to that end. Whether the imposition of judicial review on top of the Mediation Board's administrative determination would strengthen that protection is a considerable question.[2] All constitutional questions aside, it is for Congress to determine how the rights which it creates shall be enforced. *Tutun* v. *United States*, 270 U. S. 568, 576–577. In such a case the specification of one remedy normally excludes another. See *Arnson* v. *Murphy*, 109 U. S. 238; *Wilder Mfg. Co.* v. *Corn Products Refining Co.*, 236 U. S. 165, 174–175; *United States* v. *Babcock*, 250 U. S. 328, 331; *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, 404.

Generalizations as to when judicial review of administrative action may or may not be obtained are of course hazardous. Where Congress has not expressly authorized judicial review, the type of problem involved and the history of the statute in question become highly relevant in determining whether judicial review may be nonetheless supplied. See *United States* v. *Griffin*, 303 U. S. 226, 232–237. As is indicated at some length in *General Commit-*

---

[2] "Even courts have been known to make rulings thought by counsel to be erroneous." *Crane* v. *Hahlo*, 258 U. S. 142, 148.

*tee of Adjustment* v. *Missouri-Kansas-Texas R. Co., post,* p. 323, the emergence of railway labor problems from the field of conciliation and mediation into that of legally enforcible rights has been quite recent. Until the 1926 Act the legal sanctions of the various acts had been few. The emphasis of the legislation had been on conciliation and mediation; the sanctions were publicity and public opinion. Since 1926 there has been an increasing number of legally enforcible commands incorporated into the Act. And Congress has utilized administrative machinery more freely in the settlement of disputes. But large areas of the field still remain in the realm of conciliation, mediation, and arbitration. On only a few phases of this controversial subject has Congress utilized administrative or judicial machinery and invoked the compulsions of the law. We need not recapitulate that history here. Nor need we reiterate what we have said in the *Missouri-Kansas-Texas R. Co.* case beyond our conclusion that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate.

In that connection the history of § 2, Ninth is highly relevant. It was introduced into the Act in 1934 as a device to strengthen and make more effective the processes of collective bargaining. *Virginian Ry. Co.* v. *System Federation, supra,* pp. 543–549. It was aimed not only at company unions which had long plagued labor relations (*id.,* pp. 545–547) but also at numerous jurisdictional disputes between unions. Commissioner Eastman, draftsman of the 1934 amendments, explained the bill at the Congressional hearings. He stated that whether one organization or another was the proper representative of a particular group of employees was "one of the most controversial questions in connection with labor organization matters." Hearings, Committee on Interstate & Foreign Commerce, House of Representatives, on H. R. 7650, 73d Cong., 2d

Sess., p. 40.  He stated that it was very important "to provide a neutral tribunal which can make the decision and get the matter settled." *Id.*, p. 41.  But the problem was deemed to be so "highly controversial" that it was thought that the prestige of the Mediation Board might be adversely affected by the rulings which it would have to make in these jurisdictional disputes.  *Id.*, p. 40.  And see Hearings, Committee on Interstate Commerce, U. S. Senate, on S. 3266, 73d Cong., 2d Sess., pp. 134–135.  Accordingly § 2, Ninth was drafted so as to give to the Mediation Board the power to "appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election."  That was added so that the Board's "own usefulness of settling disputes that might arise thereafter might not be impaired."  S. Rep. No. 1065, 73d Cong., 2d Sess., p. 3.  Where Congress took such great pains to protect the Mediation Board in its handling of an explosive problem, we cannot help but believe that if Congress had desired to implicate the federal judiciary and to place on the federal courts the burden of having the final say on any aspect of the problem, it would have made its desire plain.

The fact that the certificate of the Mediation Board is conclusive is of course no ground for judicial review. *Great Northern Ry. Co.* v. *United States,* 277 U. S. 172, 182. Congress has long delegated to executive officers or executive agencies the determination of complicated questions of fact and of law.  And where no judicial review was provided by Congress this Court has often refused to furnish one even where questions of law might be involved.  See *Louisiana* v. *McAdoo,* 234 U. S. 627, 633; *United States* v. *George S. Bush & Co.,* 310 U. S. 371; *Work* v. *Rives,* 267 U. S. 175; *United States* v. *Babcock, supra.*  We need not determine the full reach of that rule.  See *Bates & Guild Co.* v. *Payne,* 194 U. S. 106; *Houston* v. *St. Louis Inde-*

*pendent Packing Co.*, 249 U. S. 479. But its application here is most appropriate by reason of the pattern of this Act.

While the Mediation Board is given specified powers in the conduct of elections, there is no requirement as to hearings. And there is no express grant of subpoena power. The Mediation Board makes no "order." And its only ultimate finding of fact is the certificate. *Virginian Ry. Co.* v. *System Federation, supra,* p. 562. The function of the Board under § 2, Ninth is more the function of a referee. To this decision of the referee Congress has added a command enforcible by judicial decree. But the "command" is that "of the statute, not of the Board." *Id.,* p. 562.

The statutory mandate is that "the carrier shall treat with the representative so certified." § 2, Ninth. But the scheme of § 2, Ninth is analogous to that which existed in *Butte, A. & P. Ry. Co.* v. *United States,* 290 U. S. 127. In that case Congress provided compensation to the owners of short-line railroads for losses attributable to federal control of the main systems during the first World War. The Interstate Commerce Commission was directed by § 204 of the Transportation Act of 1920 to ascertain the amount of deficits or losses and to "certify to the Secretary of the Treasury the several amounts payable" to the carriers. And the Secretary of the Treasury was "authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States for the amount shown in such certificate as payable thereto." Payments were made to the Butte company on such a certificate and the United States instituted suit to recover on the theory that the money had been disbursed on an erroneous interpretation of the statute. This Court, speaking through Mr. Justice Brandeis, held that since authority to interpret the statute was "essential to the performance of the duty imposed upon the Commission"

and since "Congress did not provide a method of review," the Government, as well as the carrier, was "remediless whether the error be one of fact or of law." *Id.*, pp. 142–143. Cf. *United States* v. *Great Northern Ry. Co.*, 287 U. S. 144.

In the present case the authority of the Mediation Board in election disputes to interpret the meaning of "craft" as used in the statute is no less clear and no less essential to the performance of its duty. The statutory command that the decision of the Board shall be obeyed is no less explicit. Under this Act Congress did not give the Board discretion to take or withhold action, to grant or deny relief. It gave it no enforcement functions. It was to find the fact and then cease. Congress prescribed the command. Like the command in the *Butte Ry.* case it contained no exception. Here as in that case the intent seems plain—the dispute was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law.

That conclusion is reinforced by the highly selective manner in which Congress has provided for judicial review of administrative orders or determinations under the Act. There is no general provision for such review. But Congress has expressly provided for it in two instances. Thus Congress gave the National Railroad Adjustment Board jurisdiction over disputes growing out of "grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." § 3, First (i). The various divisions of the Adjustment Board have authority to make awards. § 3, First (k)–(o). And suits based on those awards may be brought in the federal district courts. § 3, First (p). In such suits "the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated." The other instance in the Act where Congress provided for

judicial review is under § 9. The Act prescribes machinery for the voluntary arbitration of labor controversies. § 5, Third; § 7; § 8. It is provided in § 9 that an award of a board of arbitration may be impeached by an action instituted in a federal district court on the grounds specified in § 9, one of which is that "the award plainly does not conform to the substantive requirements laid down by this Act for such awards, or that the proceedings were not substantially in conformity with this Act." § 9, Third (a). When Congress in § 3 and in § 9 provided for judicial review of two types of orders or awards and in § 2 of the same Act omitted any such provision as respects a third type, it drew a plain line of distinction. And the inference is strong from the history of the Act that that distinction was not inadvertent. The language of the Act read in light of that history supports the view that Congress gave administrative action under § 2, Ninth a finality which it denied administrative action under the other sections of the Act.

*Shields* v. *Utah Idaho Central R. Co.*, 305 U. S. 177, is not opposed to that view. That case involved a determination by the Interstate Commerce Commission under § 1, First of the Act that the lines of the carrier in question did not constitute an interurban electric railway. The result was that the railroad company was a "carrier" within the meaning of the Act and subject to its criminal penalties. The carrier brought a suit in equity against a United States Attorney to restrain criminal prosecutions under the Act. This Court allowed the action to be maintained even though the Railway Labor Act contained no provision for judicial review of such rulings. But the decision was placed on the traditional use of equity proceedings to enjoin criminal proceedings. 305 U. S. p. 183. Moreover, it was the action of the Interstate Commerce Commission which this Court held to be reviewable. Although the authority of the Commission derived from the

Railway Labor Act, this Court quite properly related the issue not to railway labor disputes but to those transportation problems with which the Commission had long been engaged. And see *Shannahan* v. *United States*, 303 U. S. 596. The latter have quite a different tradition in federal law than those pertaining to carrier-employee relationships.

What is open when a court of equity is asked for its affirmative help by granting a decree for the enforcement of a certificate of the Mediation Board under § 2, Ninth raises questions not now before us. See *Virginian Ry. Co.* v. *System Federation, supra,* pp. 559–562.

*Reversed.*

MR. JUSTICE BLACK and MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.

MR. JUSTICE REED, dissenting:

This is an action by the petitioners, the Switchmen's Union of North America (hereinafter referred to as the Switchmen) and some of its members against the National Mediation Board, its members, the Brotherhood of Railroad Trainmen (hereafter referred to as the Brotherhood) and the New York Central Railroad Company and the Michigan Central Railroad Company, carrier employers of the members of the before-mentioned unions. The individual petitioners are members and officials of the Switchmen's Union and employees of one or the other of the carriers.

Petitioners were plaintiffs in the United States District Court for the District of Columbia. A certification of representatives for collective bargaining under § 2, Ninth, of the Railway Labor Act [1] was made by the Board to the carriers. This certification followed the invocation of the services of the Board to investigate a dispute among

---

[1] 44 Stat. 577, as amended 48 Stat. 1185.

the yardmen of the carriers as to their representative. The Brotherhood sought to be the representative for all the yardmen of rail lines, including the Michigan Central, operated by the New York Central Railroad Company and obtained the designation of participants in the election for representative of the employees upon this wide basis. The Switchmen contended that yardmen of certain designated parts of the carrier property should be permitted to choose separately their own representatives instead of being compelled to take part in a carrier-wide election.[2]

The Board of Mediation is the agency created by statute to designate employees who may participate in the selection of representatives under the Act.[3] The Board under-

---

[2] Finding 7 of the District Court shows the distribution of yardmen of the New York Central Lines based upon union affiliation, as follows:

"7. There are approximately 6,087 yardmen employed by the Railroad Company. At the time the Board's services were invoked the plaintiff Switchmen's Union represented the yardmen in all but nine yards on the New York Central—Lines West of Buffalo and in all yards on the Michigan Central west of the Detroit River, including the South Bend Transfer Crews. The defendant Brotherhood represented yardmen in yards on the Michigan Central east of the Detroit River, in nine yards on the New York Central—Lines West of Buffalo, and all yardmen on the New York Central—Lines East of Buffalo, the Toledo and Ohio Central, The Big Four, and the Boston and Albany; and at that time no one questioned the right of the Brotherhood to represent the yardmen employed on the four last mentioned lines."

[3] 48 Stat. 1185, 1188–9, § 2:

"Ninth. If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this Act, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon

took to perform this function and made its findings and conclusions after presentation of the issues by the Brotherhood, the Switchmen and other intervenors. The Board concluded that the

"Railway Labor Act vests the Board with no discretion to split a single carrier or combine two or more carriers for the purpose of determining who shall be eligible to vote for a representative of a craft or class of employees under Section 2, Ninth, of the Act, and the argument that it has such power fails to furnish any basis of law for such administrative discretion."

Consequently the Board found that the "New York Central Railroad Company and all of its operated subsidiaries . . . is a single carrier" and

"all of the employees of any given craft or class, such as yardmen, in the service of a carrier so determined must therefore be taken together as constituting the proper basis for determining their representation in conformity with Section 2, Ninth, of the Railway Labor Act.

---

receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph."

"The mediator assigned to the investigation of this dispute will therefore proceed accordingly with the completion of his duties in connection with the Board's investigation of this dispute. That is to say, he shall regard as the proper basis for the representation of, the yardmen in the service of the entire New York Central Railroad Company all of the yardmen in such service."

The election based upon this determination and certification followed in due course.

After the Board's designation of all yardmen of the carrier lines as participants in the election, the election was held and the Brotherhood chosen as the representative. As stated in the court's opinion, upon the certification of the result to the carriers, petitioners sought to have the determination by the Board of the participants and the certification of the representatives cancelled. But in addition an injunction against the Brotherhood and the carriers was asked to restrain them from negotiating agreements concerning the craft of yardmen on the carriers' lines. This suit was brought in the District Court. It was there dismissed on the ground that the conclusion of the Board that all yardmen in the service of a single carrier may be taken together as constituting a proper basis for selecting a representative for collective bargaining "is reasonable, proper and not an abuse of discretion" and therefore should not be set aside. This decree was affirmed by the United States Court of Appeals for the District of Columbia but upon the ground of lack of power in the Board to act otherwise if the lines involved were a single carrier. The unity of the carrier is accepted.[4]

---

[4] *Switchmen's Union* v. *National Mediation Board*, 135 F. 2d 785, 796:

"The argument was made to the Congressional Committees that the precise language now under consideration would bring possible repercussion in railway labor relations. Specific amendments were proposed which would have allowed the division of a craft or class. Congress

ı As treated by the Board and the courts below the problem presented by this case is one of statutory interpretation, whether or not § 2, Ninth, gives discretion to the Board to split the crafts of a single carrier into smaller units so that the members of such units may choose representatives of employees. This Court bases its conclusion upon the lack of power in any court to pass upon such an issue and leaves the interpretation of the authority granted by § 2, Ninth, finally to the Board. With this denial of judicial power, I cannot agree.

The constitutional validity of the principle of collective bargaining concerning "grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions" [5] of employees of interstate carriers is accepted.[6] It follows that the Congress, as an incident to such legislation, has the power to designate the representative of the employees or group or craft of em-

was not persuaded that the unification process was not in the best interest of employees and carriers. It is for Congress to determine policy. Our province is to keep the Board within the confines of that policy. We are of the opinion that the Board correctly determined it had no discretion to deny the request of a majority of the yardmen employed by the Railroad Company to appoint a representative for their craft."

[5] 48 Stat. 1185, 1186–7, § 2:

"(1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this Act; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."

[6] *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515, 553; *Texas & New Orleans R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548, 570.

ployees for the purpose of bargaining. Instead of making such selection itself Congress has delegated to the employees the choice of the representatives [7] and the determination of these representatives, in case of any dispute as to their identity, to the National Mediation Board. As these delegations are surrounded by adequate standards no question is raised as to the validity of the statutory provisions for the selection or determination of the representatives. Cf. *Opp Cotton Mills* v. *Administrator of Wage and Hour Division*, 312 U. S. 126, 142–146.

Where duties are delegated, as here, to administrative officers, those administrative officers are authorized to act only in accordance with the statutory standards enacted for their guidance. Otherwise we should risk administrative action beyond or contrary to the legislative will. Cf. *United States* v. *Carolina Freight Carriers Corp.*, 315 U. S.

---

[7] 48 Stat. 1185, 1187, § 2:

"Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Act. No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: *Provided,* That nothing in this Act shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization."

475, 489. The Railway Labor Act does not provide specifically for judicial review of the certification by the Mediation Board under § 2, Ninth, of representatives, even though that certification is based upon an erroneous interpretation of the statute. Nor is there any clause in the Act granting to interested parties, generally, a right to have actions of the Board reviewed. Where an Act fails to provide for review of preliminary rulings determining status in preparation for subsequent action,[8] or performing administrative duties which were not final in character,[9] such rulings have not been considered as subject to review by virtue of general statutory review provisions. The reason that review is not allowed at such a stage is that the rulings or orders are only preparation for future effective action. The *Rochester Telephone Corporation* case, 307 U. S. at 143–4, teaches that where this otherwise abstract determination of status has instantaneous, final effect, such determination comes under general statutory review provisions. In the present instance the certification of § 2, Ninth, is but a preparatory step to bring about the collective bargaining which is the essential purpose of the Act but it does have an immediate effect since it destroys the petitioners' alleged right to participate in an election based on their view of the proper electoral unit. Yet there is no direct review of the certification, general or special, by the terms of the Railway Labor Act.

Nor is there necessarily an opportunity to attack the certification in later proceedings. An award of the Adjustment Board probably could not be challenged by the parties, in a judicial proceeding for its enforcement, on the ground that the representatives were not properly

---

[8] *Rochester Telephone Corp.* v. *United States*, 307 U. S. 125, 130; *Shannahan* v. *United States*, 303 U. S. 596, 599.

[9] *United States* v. *Griffin*, 303 U. S. 226, 234; *United States* v. *Los Angeles & Salt Lake R. Co.*, 273 U. S. 299, 309–310.

chosen since this error would be irrelevant to the employee's rights.[10] On the other hand, the award of a board of arbitration under § 7 is subject to attack through statutory review provided by § 9, First, Second and Third. We construe the provision of Third (a) that the award may be impeached because "the proceedings were not substantially in conformity with this Act" to refer to the selection of bargaining representatives.[11] No other orders under the Act, legally binding on employees, spring from acts of bargaining representatives.[12]

---

[10] § 3 (m), (n), (o), (p).

[11] 44 Stat. 577, 585, § 9:

"Third. Such petition for the impeachment or contesting of any award so filed shall be entertained by the court only on one or more of the following grounds:

"(a) That the award plainly does not conform to the substantive requirements laid down by this Act for such awards, or that the proceedings were not substantially in conformity with this Act; . . ."

That "proceeding" has such a meaning is strongly indicated by § 7, First, which reads as follows:

"Sec. 7. First. Whenever a controversy shall arise between a carrier or carriers and its or their employees which is not settled either in conference between representatives of the parties or by the appropriate adjustment board or through mediation, in the manner provided in the preceding sections, such controversy may, by agreement of the parties to such controversy, be submitted to the arbitration of a board of three (or, if the parties to the controversy so stipulate, of six) persons: . . ."

A binding arbitration brought about by improperly chosen representatives would be farcical.

[12] 44 Stat. 577, 586-7, as amended by 48 Stat. 1185, 1197, § 7:

"*Emergency Board.* Sec. 10. If a dispute between a carrier and its employees be not adjusted under the foregoing provisions of this Act and should, in the judgment of the Mediation Board, threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President, who may thereupon, in his discretion, create a board to investigate and report respecting such dispute. Such board shall be composed of such number of persons as to the President may seem desirable: *Provided, however,* That

The petitioners may not have an opportunity to impeach or contest an award of a board of arbitration reached after collective bargaining. The negotiations between the certified representative and the carriers may not require orders of the Adjustment Board or the board of arbitration. Mediation may compose the differences. § 5. In such cases there is no opportunity for the petitioners to intervene. As a consequence the Switchmen's Union and its members are left without an opportunity specifically provided by the Act to contest the ruling of the Board of Mediation that the Act "vests the Board with no discretion to split a single carrier . . . for the purpose of determining who shall be eligible to vote for a representative of a craft or class of employees under Section 2, Ninth, of the Act, . . ." They exhausted their administrative remedy when they appeared before the Mediation Board. 303 U. S. 41, 50.

The members of the Switchmen's Union and the Union itself, in view of the fact that it was the bargaining representative of its members prior to this controversy (R. 79), have an interest recognized by law in the selection of representatives. *Texas & New Orleans R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548, 571. This right adheres to his condition as an employee as a right of privacy does to a person. This right is created for these employees by the Railway Labor Act and, in appropriate proceedings, a remedy, provided by the general jurisdiction of district courts, to test the extent of this right to select representatives follows from the creation of the right unless negatived by statute, withdrawal of jurisdiction or the like,

no member appointed shall be pecuniarily or otherwise interested in any organization of employees or any carrier. The compensation of the members of any such board shall be fixed by the President. Such board shall be created separately in each instance and it shall investigate promptly the facts as to the dispute and make a report thereon to the President within thirty days from the date of its creation."

when the right is claimed to be infringed. *Id.*, 569–70· *Virginian Ry. Co.* v. *System Federation*, 300 U. S. 515, 543. The remedy may not be available to parties with a standing to enforce it because, for example, the infringement may be by governmental action without consent of the Government to be sued for a wrong committed by it. The fact that the remedy may come from the general jurisdiction of the courts rather than from the review provisions of the Act is not significant. We cannot conclude that because no statutory review exists no remedy for misinterpretation of statutory powers is left. No such presumption of obliteration of rights may be entertained. *A. F. of L.* v. *Labor Board,* 308 U. S. 401, 412; *United States* v. *Griffin,* 303 U. S. 226, 238; *Shannahan* v. *United States,* 303 U. S. 596, 603.

The Court in this case and in *General Committee of Adjustment* v. *Missouri-Kansas-Texas R. Co., post,* p. 323, gives as reasons for denying power to the courts to determine the meaning of the statute the history of federal railway labor legislation and the omission of any provision in this Act for review of the determination of voting participants under § 2, Ninth.

The history of this legislation is adequately stated in the opinions to which reference is made in the preceding paragraph. From their review of the successive enactments in this field, it is plain that until the 1926 Act, the scheme for adjustment of railway labor disputes was without legal sanctions. In that Act, § 2, Third,[13] § 9, Second,[14]

---

[13] 44 Stat. 577, 578, § 2:

"Third. Representatives, for the purposes of this Act, shall be designated by the respective parties in such manner as may be provided in their corporate organization or unincorporated association, or by other means of collective action, without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other."

[14] *Id.,* 585, § 9:

"Second. An award acknowledged and filed as herein provided shall be conclusive on the parties as to the merits and facts of the con-

providing for the enforcement of arbitration awards, and § 10, authorizing emergency boards and forbidding changes in the conditions out of which the controversy arose for thirty days after the creation of an emergency board, established rights which were legally enforceable. The statute made the awards of § 9 subject to judicial control but only a dictum of this Court as to § 10 and judicial interpretation of § 2, Third, provided judicial sanction to compel compliance with their provisions. *Texas & New Orleans R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548, 564, 566–70.

The 1934 Act was directed particularly at control over the initial step in collective bargaining—the determination of the employees' representatives. Section 2, Ninth, here under examination, was an entirely new provision.[15] By the *Clerks* case, just cited, decided in 1929 and well known as a landmark of labor law, this Court had upheld judicial compulsion on the carrier to prohibit its interference in the selection of employee representatives even though there was no statutory authority for such judicial action.[16] Section 2, Ninth, of the 1934 Act created by

---

troversy submitted to arbitration, and unless, within ten days after the filing of the award, a petition to impeach the award, on the grounds hereinafter set forth, shall be filed in the clerk's office of the court in which the award has been filed, the court shall enter judgment on the award, which judgment shall be final and conclusive on the parties."

[15] Other completely new sections were the "General Purposes" of § 2 and § 2, Fourth, Fifth, Seventh, Eighth and Tenth. By Tenth criminal sanctions were applied to compel carrier compliance with the commands of Fourth, Fifth, Seventh and Eighth. These subdivisions were concerned with the right of employees to organize and to choose freely their representatives.

[16] 281 U. S. 548, 569:

"The absence of penalty is not controlling. The creation of a legal right by language suitable to that end does not require for its effectiveness the imposition of statutory penalties. Many rights are enforced for which no statutory penalties are provided. In the case of the statute in question, there is an absence of penalty, in the sense of specially prescribed punishment, with respect to the arbitral awards and

its terms a right in employees to participate in an election under the designation of the Board in accordance with the authorization of the statute. It was only natural therefore that Congress should assume that where its own creature, the Mediation Board, was charged with interference with the right of employees by a misconstruction of the statute under which it existed, that error of law would be subject to judicial examination to determine the correct meaning.

Nothing to which our attention has been called appears in the legislative history indicating a determination of Congress to exclude the courts from their customary power to interpret the laws of the nation in cases or controversies arising from administrative violations of statutory standards. No intention to refuse judicial aid in administration of the Act is apparent. Attention was called just above to the criminal sanctions written into § 2, Tenth. In addition provision is made in the Act for judicial review of the orders of the National Railroad Adjustment Board, § 3, First (p), and board of arbitration awards, § 9, Third. Furthermore, the National Mediation Board has appeared in many court cases, as here, involving its certifications and so far as appears neither the parties nor the courts have questioned judicial power.[17] The Board

---

the prohibition of change in conditions pending the investigation and report of an emergency board, but in each instance a legal obligation is created and the statutory requirements are susceptible of enforcement by proceedings appropriate to each. The same is true of the prohibition of interference or coercion in connection with the choice of representatives. The right is created and the remedy exists. *Marbury* v. *Madison*, 1 Cranch 137, 162, 163."

[17] *Brotherhood of Railroad Trainmen* v. *National Mediation Board*, 88 F. 2d 757; *National Federation of Railway Workers* v. *National Mediation Board*, 110 F. 2d 529; *Order of Railway Conductors* v. *National Mediation Board*, 113 F. 2d 531. See also *Association of Clerical Employees* v. *Railway Clerks*, 85 F. 2d 152; *Brotherhood of Clerks* v. *Virginian Ry. Co.*, 125 F. 2d 853; *Brotherhood of Locomotive*

feels that such review has been profitable.[18]   Against these later facts, the earlier reliance, prior to 1926, on voluntary action to enforce the railway labor statutes has little significance.

Nor in view of the statements and the decision in the *Clerks* case, do we think that the omission of statutory review from the provisions of § 2, Ninth, is important.

*Firemen & Enginemen* v. *Kenan*, 87 F. 2d 651; *Nashville, C. & St. L. Ry.* v. *Railway Employees' Dept.*, 93 F. 2d 340; *Brotherhood of Clerks* v. *Nashville, C. & St. L. Ry. Co.*, 94 F. 2d 97.

[18] Annual Report of the National Mediation Board, 1938, p. 5:

"The two cases decided by the courts clarifying the discretion vested in the National Mediation Board in connection with representation disputes both arose on the Nashville, Chattanooga & St. Louis Railway, and both were decided by the United States Circuit Court of Appeals for the Sixth Circuit.   The first case [*Nashville, C. & St. L. Ry.* v. *Railway Employees Department, A. F. of L.*, 93 F. 2d 340] settled the issue concerning the right of furloughed employees retaining an employment status to vote in representation elections.   The second decision [*Brotherhood of Clerks* v. *Nashville, C. & St. L. Ry. Co.*, 94 F. 2d 97] held that the National Mediation Board, when establishing eligible lists of voters and conducting elections in order to determine the representative of employees of a carrier by craft or class must do so with due regard for all of the facts, historical and otherwise, which have operated to shape the craft or class of employees on the carrier concerned as well as on railroads generally.   Both decisions are very helpful to the Board in that they serve to settle issues which, in the past, have frequently arisen to trouble the orderly and prompt adjustment of disputes over representation between different factions among employees."

*Id.*, 1942, p. 7:

"During the 8-year experience of the Board under the representation provisions of the law it is gratified to be able to report that in all but a few instances its actions in interpreting and applying these provisions of the law have been sustained by the courts.   In all instances, however, the Board has benefited by court review and analysis of its actions and the facts of the disputes.   The court rulings and opinions have clarified and settled many disputed points of the law and the Board's authority. Thus they constitute a valuable contribution in the solution of labor disputes."

The requirement of that very subsection that "the carrier shall treat with the representatives so certified" was construed as an affirmative command open to judicial enforcement without specific statutory authority. *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515, 544.

*Butte, A. & P. Ry. Co.* v. *United States,* 290 U. S. 127, is cited as authority for a conclusion that delegation of an administrative duty carries to the appointee the authority to finally construe the statute since such authority was " 'essential to the performance of the duty imposed upon the Commission' and since 'Congress did not provide a method of review,' the Government, as well as the carrier, was 'remediless whether the error be one of fact or of law.' " This was a case in which the Government ordered payments to carriers as compensation for deficits incurred during federal operation of the railways. It was determined that Congress intended to leave finally the determination of the beneficiaries to its agent, the Interstate Commerce Commission. This intention is far easier to deduce when the Congress is dealing with its own money than where it creates rights of suffrage for citizens to exercise for the improvement of their economic condition.

The *Virginian Railway* case presents a much closer analogy to the present controversy. As pointed out above, it dealt with the carrier's duty to "treat with" employees declared by § 2, Ninth. Employees sought and obtained a judicial order directing the railroad to negotiate on the ground that new duties, requirements and rights were created "mandatory in form and capable of enforcement by judicial process." Despite the absence of statutory authority for court action it was held Congress intended legal sanction. A prohibition of negotiation, such as petitioners seek here, is *a fortiori,* within judicial competence.[19]

---

[19] Compare *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 391, where this Court took cognizance of a suit seeking judicial review

One factor to test the intention of Congress, it is suggested in the M. K. T. opinion of today, *post,* p. 323, is whether Congress was willing to crystallize the problem into "statutory commands." The statutory command for which determination is sought here is that the Board exercise its discretion. In the same opinion, it is said, "the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforcible in the courts should be implied." Here, Congress has unequivocally provided that "employees shall have the right to organize and bargain collectively through representatives" chosen by the majority of each "craft or class." The special competence of the National Mediation Board lies in the field of labor relations rather than in that of statutory construction. Of course the judiciary does not make the administrative determination. "The functions of the courts cease when it is ascertained that the findings of the Commission meet the statutory test." *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381, 400. Likewise, the National Mediation Board may be conceded discretion to make any reasonable determination of the meaning of the words, "craft or class." Cf. *Gray* v. *Powell,* 314 U. S. 402. By requiring a plain sanction for a judicial remedy, the court authorizes the Mediation Board to determine not only questions judicially found to be committed to its discretion, as in *Gray* v. *Powell, supra,* but the statutory limits of its own powers as well. It seems more consonant with the genius of our institutions [20] to assume,

---

of administrative action without such authority in the statute under attack. See § 6, Bituminous Coal Act, 50 Stat. 85. Review was had under Judicial Code § 24 (1) and 28 U. S. C. § 380 (a).

[20] An erroneous order of the Secretary of the Interior was similarly canceled when, without statutory authority, he struck the name of an enrollee from the rolls of an Indian Nation. This Court said: "But, as has been affirmed by this court in former decisions, there is no place in our constitutional system for the exercise of arbitrary

not that the purpose to apply a legal sanction must be plain, but that in the absence of any express provision to the contrary, Congress intended the general judicial authority conferred by the Judicial Code to be available to a union and its members aggrieved by an administrative order presumably irreconcilable with a statutory right so explicitly framed as the right to bargain through representatives of the employees' own choosing.[21]

The petitioners assert their rights as rights arising under the Railway Labor Act, which is stated to be a law of the United States relating to interstate commerce. If this allegation is correct, and we think it is, there is jurisdiction of the subject matter of the suit under Judicial Code, § 24 (8): "The district courts shall have original jurisdiction as follows: . . . Eighth. Of all suits and proceedings arising under any law regulating commerce." The general purpose of the Act is to avoid interruption to commerce by prohibition of interference with the employees' freedom of association and by provision for collective bargaining to settle labor disputes.[22] This regulates commerce.

---

power, and if the Secretary has exceeded the authority conferred upon him by law, then there is power in the courts to restore the status of the parties aggrieved by such unwarranted action." *Garfield* v. *Goldsby*, 211 U. S. 249, 262. Cf. *Ness* v. *Fisher*, 223 U. S. 683, 694. Compare *Ickes* v. *Fox*, 300 U. S. 82; *West* v. *Standard Oil Co.*, 278 U. S. 200, 220; *Work* v. *Louisiana*, 269 U. S. 250, 254.

[21] When Congress has intended to bar access to the courts, in whole or in part, it has understood how to express its determination. Emergency Price Control Act of 1942, § 204, 56 Stat. 23; chap. 335, 23 Stat. 350; § 4 (b), 44 Stat. 828.

[22] 48 Stat. 1185, 1187, § 2:

"First. It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." See note 5.

The right to select representatives with whom carriers must bargain was created by the Act and the remedy sought here arises under that law. Since the cause of action "had its origin and is controlled by" the Railway Labor Act, it arises under it. *Peyton* v. *Railway Express Agency,* 316 U. S. 350; *Mulford* v. *Smith,* 307 U. S. 38, 46; *Turner Lumber Co.* v. *Chicago, M. & St. P. Ry. Co.,* 271 U. S. 259, 261; *Louisville & Nashville R. Co.* v. *Rice,* 247 U. S. 201.

Since the Court declines federal jurisdiction, it is useless to discuss either the merits or the other procedural questions such as jurisdiction in equity to grant the injunction requested, the power to vacate the order of the Mediation Board or the effect of the Norris-La Guardia Act.

Mr. Justice Roberts and Mr. Justice Jackson join in this dissent.