**AIRCRAFT MECHANICS
FRATERNAL ASSOCIATION,
Plaintiff,**

v.

**NORTHWEST AIRLINES CORPO-
RATION a/k/a Northwest Air-
lines, Inc., Defendant.**

**No. Civ.05–76 PAM/RLE.**

United States District Court,
D. Minnesota.

Feb. 11, 2005.

Nicholas Paul Granath, Seham Seham Meltz & Petersen, Mpls, MN, Aliki Recklitis, Seham Seham Meltz & Peterson, Mercer Island, WA, for Plaintiff.

John J. Gallagher, Kenneth M. Willner, Paul Hastings Janofsky & Walker LLP, Washington, DC, Timothy Gary Gelinske, Timothy R. Thornton, Briggs & Morgan, Minneapolis, MN, for Defendant.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court on cross Motions for a Preliminary Injunction. For the reasons that follow, the Court denies Plaintiff's Motion and grants Defendant's Motion.

## BACKGROUND

Plaintiff Aircraft Mechanics Fraternal Association ("AMFA") has represented Northwest Airline employees in the Technician, Cleaner and Custodian craft and class since 1999.[1] AMFA has historically used rank and file members to observe negotiations and consults with observers in private caucuses while negotiations are ongoing. Indeed, AMFA has promulgated a policy statement that gives rank and file members the right to observe contract negotiations. AMFA believes that having observers present reflects its philosophy of putting democracy back into unionism.

Defendant Northwest Airlines Corporation ("Northwest") consented to observers at the prior round of collective bargaining between AMFA and Northwest, which occurred from October 1999 to May 2001. In addition, Northwest agreed to hold bargaining sessions at multiple locations across the United States where Northwest employed AMFA-represented workers.

Whether the observers hindered the prior negotiations is disputed. Northwest contends that the observers delayed the negotiations and adversely affected the dynamics at the bargaining table. Specifically, Northwest claims that the AMFA Negotiating Committee aggrandized when the observers were present, and that more candid, solution-oriented discussions were unable to occur. In contrast, AMFA contends that the observers maintained strict professional standards of participation. It also notes that Northwest issued a statement welcoming the observers and commending them for their professional demeanor and courtesy. Finally, AMFA submits that the successful ratification of the Collective Bargaining Agreement ("Agreement") was due to the sense of ownership and confidence that the observers gave to the bargaining process.

Article 31 of the Agreement provides that Northwest may propose amendments to the Agreement on October 14, 2004, and that AMFA may do so on November 4, 2004. The AMFA opener requested a number of bargaining protocols, including that Northwest agree to (1) the use of observers during the negotiations, and (2) hold negotiating sessions in multiple city locations to accommodate the observers. Northwest refused both of these conditions.

The Northwest opener proposed a negotiating schedule that provided for three days per week of negotiations for the remainder of 2004, and five days per week in 2005. Northwest believed the aggressive schedule was necessary in light of Northwest's shaky financial condition and need for immediate labor cost reduction. AMFA agreed to meet one day in November 2004 and two days in December 2004. The parties met, with AMFA protesting the company's refusal to allow observers or to meet at different locations.

Because AMFA insisted on these negotiating protocols and refused to implement an aggressive bargaining schedule, Northwest applied to the National Mediation Board on January 4, 2005, for mediation under 45 U.S.C. § 155. Shortly thereafter, the Board established mediation

1. Previously, International Association of Machinists ("IAM") represented the employees. According to AMFA, the decision to replace IAM was because of AMFA's philosophy of democratic openness and the perceived lack of openness surrounding a tentative agreement negotiated earlier by IAM, which union members ultimately rejected.

ground rules, including a rule prohibiting observers from attending the sessions. The parties have yet to commence mediation because of their dispute as to whether observers may attend the mediation sessions. (*See* Nat'l Mediation Bd.'s Resp. to Mots. for Prelim. Inj. at 7.)

In the meantime, the parties met on January 12, 2005, in Minneapolis. In addition to seventeen AMFA observers, two representatives of the Professional Flight Attendants Association ("PFAA") were present. Northwest refused to bargain because AMFA refused to exclude the observers and the PFAA representatives.

AFMA commenced this action the next day. AMFA claims that Northwest is violating the Railway Labor Act by (1) interfering with the choice of AMFA representatives, (2) interfering with the organization of employees, (3) failing to engage in mandatory collective bargaining, and (4) failing to treat with certified labor representatives. Northwest has counterclaimed, alleging that AMFA is violating the Railway Labor Act by refusing to bargain unless AMFA and PFAA observers are allowed to attend bargaining sessions, and by refusing to participate in mediation under the terms directed by the Board.

In its Motion, AMFA asks the Court to enjoin Northwest from conditioning bargaining on the exclusion of observers and to order Northwest to engage in bargaining with observers present. Northwest seeks a preliminary injunction requiring AMFA to participate in the mediation without observers.[2]

## DISCUSSION

### A. The Railway Labor Act

The Railway Labor Act, 45 U.S.C. § 151 *et seq.*, provides for the "prompt and orderly settlement" of labor-management disputes in the airline industry, and protects commerce from disruptions that such disputes may cause. 45 U.S.C. § 151a. The Act requires that carriers and employees "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and ... settle all disputes ... to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, First.

### 1. *Representation*

■ When a dispute arises, the Act requires that representatives designated by each party confer. *Id.*, Second. A "representative" is "any person or persons, labor union, organization or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." *Id.* § 151, Sixth. Thus, a union may designate a member of another union as its representative on its negotiating committee. *Minn. Mining & Mfg. Co. v. NLRB*, 415 F.2d 174, 178 (8th Cir.1969); *Gen. Elec. Co. v. NLRB*, 412 F.2d 512, 517–20 (2d Cir.1969).

The Act prohibits one party from interfering, influencing, or coercing the other in its choice of representatives. 45 U.S.C. § 152, Third. In addition, the Act provides:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class.... No carrier ... shall deny or in any way question the right of its employees to join, organize,

---

2. The National Mediation Board has also filed a Motion for Leave to Intervene. Because both parties assent to the intervention and the Court finds that intervention is appropriate under Federal Rule of Civil Procedure 24, the Court grants the Motion.

or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees.

*Id.*, Fourth.

Although the Act requires that representatives confer, the Act is silent regarding the presence of observers during negotiations.

### 2. *Dispute Resolution*

The Railway Labor Act provides a detailed framework to facilitate the voluntary settlement of major disputes. *Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.*, 930 F.2d 45, 46 (D.C.Cir.1991) (citation omitted). Either party proposing changes to an existing collective bargaining agreement must give the other party advanced, written notice of its proposals. 45 U.S.C. § 156. Designated representatives of the parties must then establish a time and place to commence bargaining and promptly confer on the matters raised. *Id.; see also* 45 U.S.C. § 152, Sixth. Once the discussions are noticed, parties must maintain status quo

with respect to their contract and established conditions. 45 U.S.C. § 156.

If the parties cannot resolve their dispute through conference, either party may invoke the services of the National Mediation Board. 45 U.S.C. § 155, First. The Board must then "put itself in communication with the parties" and "use its best efforts, by mediation, to bring them to agreement." *Id.* Once begun, the mediation is a mandatory process and continues until the parties reach an agreement or the Board determines that mediation efforts have failed.[3] *Id.*

### B. Injunctive Relief

■ An injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest favors the movant; and (4) that the movant will suffer irreparable harm absent the injunction. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981). Injunctive relief is considered to be an extraordinary remedy that is not to be routinely granted. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003) (citation omitted). Thus, the party seeking injunctive relief bears the burden of proving all *Dataphase* factors.[4]

---

**3.** If the Board fails to mediate the dispute and if it determines the dispute substantially threatens "to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," then the President may create an emergency board to arbitrate the dispute and "to report to the President respecting such dispute." 45 U.S.C. § 160. If arbitration fails, then there is a mandatory 30–day cooling-off period during which neither party may change the conditions out of which the dispute arose. *Id.* If the alternative forms of dispute resolution fail and the cooling period expires without producing an agreement, the parties resort to self-help, *i.e.*, the employer may unilaterally change rates of pay, rules, or working conditions and the union may strike. *Nat'l R.R. Passenger Corp. v. Transp. Workers*

*Union of Am.*, 373 F.3d 121, 124 (D.C.Cir. 2004).

**4.** Relying on *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989), Northwest contends that it need not show irreparable injury to obtain an injunction. However, *Consolidated Rail Corp.* holds that "district courts have subject matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury." *Id.* at 303, 109 S.Ct. 2477. This case is not about maintaining the status quo of pay rates, rules or working conditions. Rather, it is about the process of settling disputes about those terms. Thus, the Court finds *Consolidated Rail Corp.* inapposite and holds that the parties must show irreparable harm.

1. *Jurisdiction*

 Before delving into the analysis of the *Dataphase* factors, the Court must first determine whether it has jurisdiction to order injunctive relief. The Court's jurisdiction to review decisions of the National Mediation Board is extremely narrow, as Congress vested the Board with broad discretion to mediate labor disputes. *Local 808 Bldg. Maint., Serv. & R.R. Workers v. Nat'l Mediation Bd.*, 888 F.2d 1428, 1437 (D.C.Cir.1989). A court is "not entitled to prevent the Board from experimenting with any mediation device that can fairly be said to be designed to settle a dispute without a strike and does not independently offend other laws." *Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.*, 930 F.2d 45 (D.C.Cir. 1991). Courts "have only an extraordinarily limited authority to review decisions of the Board" and do not have jurisdiction to interfere with the Board's process "absent a showing of patent official bad faith." *Local 808 Bldg. Maint., Serv.*, 888 F.2d at 1433–34 (internal quotations and citations omitted). Accordingly, courts generally refuse to interfere with Board mediation. *See Trans World Airlines v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 441, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989) (internal quotations and citations omitted) (effectiveness of the private dispute resolution procedures set forth in the Act depends on the "assurance that neither party will be able to enlist the courts to further its own partisan ends"); *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 303, 64 S.Ct. 95, 88 L.Ed. 61 (1943) (Congress took "great pains" to avoid any impairment of the Board's usefulness in settling disputes).

The Act expressly requires bargaining to take place through representatives. In accord with the Act, the Board requires each party to designate its primary representative in advance of the mediation sessions. (Gibbons Decl. ¶ 13.) Each party acts through its designated representative, who is typically accompanied by a negotiating committee at the bargaining table. (*Id.*)

 However, the Act is silent on a party's right to have observers during negotiations. Because the Act does not expressly confer such a right, the Board mediator has the discretion to determine whether circumstances warrant observers at the sessions. After analyzing the parties' positions on various issues, the mediator in this case determined that presently allowing observers would disrupt the progress and prospects for success of the mediation process. (*Id.* ¶ 15.) The mediator also reserved the right to allow observers at future sessions if deemed appropriate. (*Id.* ¶ 9.) Because the mediator is not offending any statutory right of parties, the Board is not acting in bad faith by excluding observers. Accordingly, the Court does not have jurisdiction to review the Board's prohibition of observers.

 In contrast, the Court has jurisdiction to enforce the provision of the Railway Labor Act and compel the parties to bargain in good faith. *Chicago v. N.W. Ry. v. UTU*, 402 U.S. 570, 577–84, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *Am. Train Dispatchers Dep't of the Int'l Bhd. of Locomotive Eng'rs v. Fort Smith R.R. Co.*, 121 F.3d 267, 271 (7th Cir.1997) ("while our jurisdiction to review Board decision is limited, our jurisdiction to enforce provisions of the Act is not").

In *American Train Dispatchers*, the Board directed negotiations to take place in Washington, D.C., but the carrier would only attend mediation sessions in its hometown. The Seventh Circuit found a violation of 42 U.S.C. § 152, First because "the parties' obligation to 'exert every reasonable effort' is given shape by the recommendations of" the Board. *Am. Train*

**1088**

*Dispatchers,* 121 F.3d at 270 (citation omitted). It reasoned that the carrier could effectively refuse to continue negotiations by refusing to attend mediation sessions on the basis of location. As a result, the Board's "primary resource, the ability to force continuing negotiations almost interminably, would be thwarted." *Id.* at 272. The Court therefore upheld a permanent injunction to protect the mediation process and to enforce the Board's decision regarding mediation. Based on *American Train Dispatchers,* the Court holds that it has jurisdiction to order the parties to follow the Board's directives to mediate without observers present.

This holding requires the Court to distinguish between observers and representatives, which goes to the heart of this case.

### 2. *AMFA's Motion*

AMFA asks the Court to enjoin Northwest from conditioning bargaining on the exclusion of observers. AMFA maintains that the AMFA and PFAA observers are representatives as defined by the Railway Labor Act and are "an integral part of AMFA's bargaining committee, valuable for their input and assistance during bargaining, and critical to ensure the confidence of rank and file in assessing any tentative agreement that might be reached." (AMFA Memo. in Supp. of Mot. for Prelim. Inj. at 1.)

However, several factors contravene finding that the observers are "representatives" as defined by the Act. First, the AMFA Constitution specifies that its Negotiating Committee is composed of: (1) the Regional Director selected by the National Executive Counsel, (2) an Airline Contract Administration Coordinator, (3) a Cleaner/Utility Negotiator, and (4) between one and three Negotiating Representatives elected by local members. (*See* Brodin Aff. Ex. 1.) Thus, AMFA has already designated a Negotiating Committee to act for the union in bargaining, and the observers are not part of that committee.[5] Second, the observers are not "designated by" the employees. *See* 45 U.S.C. § 151, Sixth. To the contrary, the observers are selected by lottery to attend negotiations each day. Finally, the observers do not "act for" the employees. *Id.* Rather, they simply silently spectate the negotiating process for "a couple of hours, a half-day or all day if time permits." (Wildermuth Aff. Ex. 10 ¶¶ 10, 29.) One AMFA publication describes the observers as follows:

> This is a unique opportunity to see your Company and Union in action. For the first time, you will be able to evaluate for yourselves how effective *your negotiators* are and how *they represent your* class and craft at the table. You will also be able to see the other side of the negotiating process and come to your own conclusions regarding the Company and their positions.

(*Id.* Ex. 4) (emphasis added).

The Court further notes that AMFA officials have recognized the distinction between representatives and observers. James Young, Chairman of AMFA's Negotiating Team, wrote:

> While the Railway Labor Act does not prohibit observers, it also does not state that observers may be included. They are not covered under the Act at all. What is covered is the requirement for this Association to meet with the Company. As much as we prefer to have

---

5. AMFA does not contend that either Northwest or the Board is interfering with the composition of the Negotiating Committee.

observers present, we cannot mandate they be at the table.

(Hagen Showers Aff. Ex. 3.)

 Simply put, the observers are not "representatives" as defined by the Act. Thus, Northwest is not infringing on AMFA members' rights to choose their representatives by insisting that observers be excluded from negotiations. It is merely insisting that only those representatives—and not mere observers—come to the bargaining table.

Because the Court finds that the AMFA and PFAA observers are not representatives as defined by the Act, the Court finds that AMFA has failed to demonstrate a probability of success on the merits of its claims. In particular, the Court finds that AMFA has failed to show that its members will be deprived of a fundamental right to representation of their choice. Rather, all that they have been deprived of is the opportunity to view those representatives in action. The Railway Labor Act does not create a substantive right to observation of negotiations. Thus, AMFA has also failed to show irreparable harm.

### 3. *Northwest's Motion*

 Northwest seeks a preliminary injunction requiring AMFA to participate in the mediation without observers. As the Court previously stated, it must defer to the Board's directive that observers be

excluded from collective bargaining negotiations. However, the Court has jurisdiction to order the parties to follow the Board's directives. The Court finds that such an order is appropriate. Because Northwest is seeking relief consistent with the Board's mandate, Northwest has satisfied all *Dataphase* factors.

Specifically, Northwest has demonstrated that it will likely succeed on its counterclaim because AMFA has refused to exclude AMFA and PFAA observers from negotiations. Although AMFA has appeared for all scheduled meetings, it has also refused to excuse the observers. In addition, AMFA has informed the Board mediator that it has a right to bring observers to the mediation sessions. (Gibbons Decl. ¶ 12.) Finally, one union leader has stated publicly that AMFA is "not going to meet with Northwest Airlines without our observers in the room unless the federal judge tells us we have to." Liz Fedor, "NWA–Union Talks Still Stalled Over Observers," Minneapolis Star Tribune, Jan. 21, 2005, at www.startribune.com. Based on this conduct and these statements, the Court finds that Northwest can show that AMFA is refusing to participate in mediation as directed by the Board.[6]

In addition, Northwest has shown that it will sustain irreparable harm if AMFA prolongs and delays negotiations by insist-

---

6. AMFA argues that Northwest has unclean hands because Northwest—not AMFA—walked away from the bargaining table. A federal court cannot grant an injunction in a labor dispute where the movant "has failed to comply with any obligation by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. A party seeking injunctive relief under the Railway Labor Act must comply with 29 U.S.C. § 108. *Itas-

ca Lodge 2029 of the Bhd. of Ry. & Steamship Clerks, Freight Handlers, Express & Station Employees v. Ry. Express Agency, Inc.*, 391 F.2d 657, 667 (8th Cir.1968). Nevertheless, this argument fails. Northwest has offered evidence that it is willing to negotiate with AMFA. Indeed, it was Northwest who commenced the mediation process. Although Northwest is refusing to bargain with observers present, Northwest is not violating its duty to bargain in good faith because AMFA has no statutory right to require that observers be present.

ing on observers. Northwest has sustained tremendous financial losses during the past four years. Like other major air carriers, Northwest is seeking to reduce labor costs to avoid further financial crisis. Delays in negotiations inevitably preclude opportunities to negotiate new terms favorable to both parties. Thus, the balance of harms also favors an injunction ordering the parties to mediate under the auspices of the Board.

Finally, the parties agree that public interest favors the issuance of an injunction so that labor relations in the airline industry will not be disrupted. In addition, public interest is served when collective bargaining is conducted as Congress mandated under the supervision of the Board.

## CONCLUSION

Congress has not conferred jurisdiction to this Court to review a decision by the National Mediation Board, absent a finding of official bad faith. There are no allegations of official bad faith in this case. Thus, the Court will not review the Board's directive to exclude observers from mediation.

In contrast, the Court has jurisdiction to order the parties to follow the Board's directives as it relates to the mediation process. The Court rejects AMFA's argument that the AMFA and PFAA observers are representatives as defined by the Railway Labor Act. Thus, the Court orders the parties to mediate under the auspices of the Board with no observers present. Accordingly, it is **HEREBY ORDERED** that:

1. Defendant Northwest Airlines Corporation's Motion for a Preliminary Injunction (Clerk Doc. No. 3) is **GRANTED**;

2. Plaintiff Aircraft Mechanics Fraternal Association's Motion for a Preliminary Injunction (Clerk Doc. No. 16) is **DENIED**; and

3. Motion to Intervene by the National Mediation Board (Clerk Doc. No. 21) is **GRANTED**.