**PAN AMERICAN WORLD AIRWAYS, INC., Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS (the "Teamsters" or "IBT") et al., Defendants.**

**No. 67 Civ. 3257.**

United States District Court
S. D. New York.

Nov. 9, 1967.

988

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for plaintiff. Herbert Prashker, Eric Rosenfeld, New York City, of counsel.

Reilly, Curry· & Gibbons, New York City, Mulholland, Hickey & Lyman, Washington, D. C., for defendants Brotherhood of Railway Airline Clerks (BR AC) Harry Higby, Oleg Stowbunenko-Saitchenko, Mario Parasole, and Joseph Halloran, David T. Gibbons, Paul G. Reilly, Jr., New York City, James L. Highsaw, Jr., Washington, D. C., William J. Donlon, Denver, Colo., of counsel.

Herbert S. Thatcher, Washington, D. C., Cohen & Weiss, New York City, for defendant International Brotherhood of Teamsters, Airline Division. Samuel J. Cohen, New York City, of counsel.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

This suit arises out of a lengthy and bitter dispute between defendant Brotherhood of Railway Airline and Steamship Clerks [1] (Clerks Union) and defendant

---

1. This union was formerly named the Brotherhood of Railway Clerks.

International Brotherhood of Teamsters (Teamsters Union) over union representation of some 8,000 clerical and related employees of Pan American World Airways, Inc. (Pan Am), a major international air carrier. Representation proceedings under Section 2, Ninth, of the Railway Labor Act, 45 U.S.C. § 152, Ninth, arising out of this dispute have for a long time been and are still pending unresolved before the National Mediation Board (NMB).

The Clerks Union entered into the current collective bargaining agreement with Pan Am on behalf of these employees and that agreement is now ripe for renegotiation. Despite the pending representation proceedings before the NMB the Clerks Union demanded that Pan Am enter into negotiations with it for a new agreement. Pan Am took the firm position that the Railway Labor Act prohibited such negotiations while the representation proceedings before the NMB were pending. The Clerks Union nevertheless called a strike to compel Pan Am to conduct such negotiations immediately.

In this action Pan Am seeks a judgment pursuant to 28 U.S.C. § 2201 declaring that the Railway Labor Act prohibits it from negotiating a new collective bargaining agreement while the representation proceedings are pending, and also seeks injunctive relief against the strike called by the Clerks Union.

The Clerks Union challenges the jurisdiction of the court to adjudicate the questions presented or to grant the injunctive relief sought. It asserts that in any event Pan Am is violating the Railway Labor Act by refusing to negotiate with it and is not entitled to injunctive relief.

The Teamsters Union joins in seeking the same relief as Pan Am.

On the argument before me of a motion by Pan Am for an injunction pendente lite against the strike by the Clerks Union, it appeared that the facts for all practical purposes were undisputed and that everything necessary to a final determination of the action on the merits was before the court. At my suggestion the parties stipulated that the court should determine the merits of the action and render final judgment on the record before it.

## Facts

The rather complicated facts giving rise to the action are as follows:

In May 1946 the NMB certified the Clerks Union as the collective bargaining agent representing the clerical and related employees of Pan Am. Since then successive collective bargaining agreements between the Clerks Union and Pan Am were negotiated and went into effect. The last of these agreements became effective on January 1, 1965 to "continue in full force and effect through March 16, 1967 and thereafter, unless written notice of intended change is served at least thirty days in advance of March 16, 1967, or any date thereafter in accordance with Section 6, Title 1 of the Railway Labor Act as amended.[2]

On August 6, 1965, the Teamsters Union filed a representation petition with the NMB pursuant to Section 2, Ninth, of the Act, claiming the right to represent the clerical and related employees of Pan Am. The Board docketed the case as No. 3781, found that the Teamsters had made a showing of approved authorizations from a majority of the class or craft sought to be represented, as required by Section 1206.2 of the Board's regulations, 29 C.F.R. § 1206.2, and ordered an election. The election was conducted between August 8 and September 7, 1966. The Clerks Union refused to have its name appear on the ballot, taking the position that if the Teamsters failed to obtain more than 50% of the

2. Plaintiff's Exhibit D, attached to Supplemental Complaint—Agreement between Pan American World Airways, Inc., and the Air Transport Division, Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees AFL/CIO, representing Clerical and Related Employees Effective January 1, 1965, Article 37.

eligible votes the Clerks Union would remain as the certified bargaining representative. Thus only the Teamsters Union appeared on the ballot.

The first election was challenged by the Clerks Union. On October 4, 1966, the Board set aside the election on the ground that "fraudulent representations" and "elements of campaign trickery" had created a serious doubt whether the balloting had been conducted in an atmosphere permitting the voters to exercise a free and untrammeled choice. The ballots were impounded and a new election was ordered with ballots to be mailed to all eligible voters on November 14, 1966 for return by December 12, 1966.

Thereupon the Clerks Union commenced an action in the District Court for the District of Columbia to enjoin the election. A dismissal for want of jurisdiction was affirmed by the Court of Appeals. Brotherhood of Railway and Steamship Clerks etc. v. National Mediation Board, 374 F.2d 269 (D.C.Cir. 1966).

Thereafter the ballots were counted. Of 6936 employees eligible to vote 3091 cast ballots for the Teamsters and 426 voted for other organizations, with 39 void ballots. In this election also only the Teamsters appeared on the ballot. The Clerks Union challenged the second election on a variety of grounds. The District Court and the Court of Appeals in the action brought by the Clerks to enjoin the second election had expressed concern that the second election was scheduled too soon after the first and that the effect of communications alleged to have been fraudulent on the voting employees had not been fully dissipated by the Board's election communication. The Board, in light of the courts' views reviewed the election at length. It was not until September 12, 1967, some nine months after the second election had been held, that the Board handed down a decision in which it set aside the second election, primarily on the ground that it had erroneously failed to require the incumbent Clerks Union either to have its name on the ballot or to inform the Board that it had abandoned its right to represent the employees concerned.[3] It ordered a new election at which the Clerks Union as well as the Teamsters Union was to appear on the ballot unless the Clerks Union elected to abandon its right of representation and appointed a mediator to conduct the election. The date of the election has not yet been fixed.

In the meantime, while the challenge to the second election was pending and undetermined before the NMB, on February 14, 1967, the Clerks Union served a Section 6 demand upon Pan Am calling for re-negotiation of the subsisting collective bargaining agreement. Pan Am advised the Clerks Union that it considered it unlawful under the Railway Labor Act for it to bargain with respect to a new contract until the representation proceedings before the NMB were finally resolved and it was determined which Union was to represent its employees. Pan Am requested the NMB to expedite its decision on the representation question.

By August 1967 both Unions understandably were becoming impatient with the very long delay of the Board in determining representation. On August 24, 1967 there was a work stoppage by clerical employees of Pan Am at Kennedy Airport, apparently in protest against the delay. The Clerks Union urged the employees to return to work stating "Unauthorized work stoppages are in violation of our constitution, contract and federal law." [4]

Pan Am thereupon commenced this action against both Unions, seeking a declaration that the work stoppage was

3. See In the Matter of Representation of Employees of Pan American World Airways, Inc., Clerical Office and Related Employees, National Mediation Board Case No. R–3781 (Sept. 12, 1967), Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees v. NMB.

4. Plaintiff's Exhibit E, attached to complaint.

illegal under the Railway Labor Act and an injunction against the Teamsters Union only. It immediately moved for a preliminary injunction enjoining the Teamsters from causing a strike or work stoppage to protest the failure of the NMB to resolve the representation question. On August 25, 1967 Judge Wyatt issued a temporary restraining order to this effect and the work stoppage ended. This action then remained in abeyance until the NMB handed down its decision on September 12, 1967, setting aside the second election and ordering a third.

Upon learning of this decision the Clerks Union renewed its demand that Pan Am immediately commence negotiations with it regarding the new contract. Pan Am reiterated its previous position that negotiations during the pendency of the representation proceedings would violate the Railway Labor Act.

Dennis, the International President of the Clerks Union, then wrote to the NMB seeking a clarification of the bargaining obligations of Pan Am and the Clerks [5] pending the outcome of the newly ordered election and also inquiring as to the status of any agreements that might be made with it as a result of such negotiations. The reply of the Board on September 14th was, to say the least, highly ambiguous and left the questions posed to the Board completely up in the air.[6]

When Pan Am adhered to its position with respect to the illegality of negotiation, the Clerks Union on September 18, 1967, called a strike for September 20th.

On the night of September 18, 1967, the NMB, by telegram, proffered its mediation services under Section 5, First, of the Railway Labor Act on the dispute which caused the strike. It docketed the dispute as Case E-329, stating "Parties are requested to respect provisions of the RLA and organization is requested to defer strike action pending handling of the dispute in accordance with provisions of the Act." When the Clerks Union failed to call off the strike on September 19, 1967 Pan Am served a supplemental complaint in this action seeking both a judgment declaring that negotiations with the Clerks Union were unlawful under the Railway Labor Act while representation proceedings were pending and injunctive relief against the strike called by the Clerks Union. Simultaneously it brought on a motion for a preliminary injunction restraining the Clerks Union from causing or carrying on a strike and an application for a temporary restraining order to that effect. These applications came on before me on

5. In pertinent part, Dennis' letter read: "It is our understanding that the present status of Case Number R–3781 does not constitute any legal bar to negotiations between the Brotherhood of Railway & Airline Clerks and Pan American World Airways on the issues raised by the Section 6 notices served by the Brotherhood on Pan American." Plaintiff's Exhibit B, attached to Supplemental Complaint.

6. The Board's letter, in pertinent part, reads as follows: "During the pendency of this representation case, the certified bargaining agent remains unchanged. The obligations of the carrier toward the bargaining agent, as set forth in Section 2 First of the Railway Labor Act, also remain unchanged.

You also inquire as to the status of agreements made by the certified bargaining representative. The Board in its first Annual Report on page 23 made the following comment:

'When there is an agreement in effect between the carrier and its employees signed by one set of representatives and the employees choose new representatives who are certified by the Board, the Board has taken the position that a change in representation does not alter or cancel any existing agreement made in behalf of the employees by their previous representatives. The only effect of a certification by the Board is that the employees have chosen other agents to represent them in dealing with the management under the existing agreement. If a change in the agreement is desired, the new representatives are required to give due notice of such desired change as provided by the agreement or by the Railway Labor Act. Conferences must then be held to agree on the changes exactly as if the original representative had been continued.' "

September 19, 1967. Leave to file a supplemental complaint was granted, a temporary restraining order was issued and, as previously indicated, the court took the action under advisement for decision on the merits. At the request of the parties October 20, 1967 was fixed as the date for the submission of all papers and the temporary restraining order was successively extended by stipulation, approved by the court, to November 9, 1967. On September 28, 1967 the temporary restraining order of August 24 against the Teamsters Union was dissolved by stipulation, the motion for a preliminary injunction against the Teamsters was withdrawn, and the Teamsters joined in seeking the same declaratory and injunctive relief requested by Pan Am.

There have been further developments since these applications were argued on September 19. On September 20, 1967, the day after the temporary restraining order was issued the parties met with the NMB in Washington.[7] At the conclusion of the meeting the NMB Chairman issued the following statement:

The Board has met with the parties and is happy to announce that normal operations have resumed pursuant to its request. The Board will be in further contact with the parties, but it is not unmindful of the litigation pending in New York.[8]

The mediator appointed by the NMB to conduct the third representation election was scheduled to come to New York on October 10, 1967, to commence making arrangements for that election. However, on September 28, 1967 the Clerks Union filed a petition with the NMB for reconsideration of its decision of September 12th setting aside the second election and directing a third, asserting, among other things, that the Teamsters Union was not supported by authorization cards from a majority of the employees involved and that the Board's ruling that the name of the incumbent Clerks Union must appear on the ballot, or it must elect to withdraw as representative of the employee group was erroneous.

The petition for reconsideration was argued before the Board on October 12, 1967 and in the meantime the mediator's trip to New York was postponed. On October 24, 1967 the Board made its findings and order on the petition for reconsideration, ruling that sufficient authorization cards had been filed by the Teamsters to require the election and refusing to change its determination that the Clerks Union must elect to appear on the ballot or withdraw.

Pan Am has continued to press the Board for a prompt final determination of the representation question and has consistently stated its willingness to negotiate with any representative of the Clerical employees certified by the Board.

I.

The threshold question raised by the Clerks Union goes to the power of the court to determine the merits of Pan Am's application for a declaration that it is unlawful under the Railway Labor Act

7. The affidavit of Robert S. Hogueland for the plaintiff gives the following report of what transpired at the meeting. "The E–329 conference consisted of a discussion of the BRAC's strike, which had ended a few hours earlier, and of the instant lawsuit which plaintiff had commenced the previous day. The Pan-American representatives informed the National Mediation Board that a temporary restraining order against BRAC strike action would be in effect for at least 30 days from September 19; that this court was going to decide the strike issue, namely, plaintiff's refusal to negotiate with BRAC on the ground of the unlawfulness of such negotiations during the pendency of the BRAC-Teamsters representation dispute before the National Mediation Board and after the National Mediation Board's recent (September 12) direction of an election in that dispute; that the BRAC was to have 20 days from September 19 to submit affidavits and briefs in the suit; and that plaintiff would continue to refuse to bargain with the BRAC until the strike issue was judicially settled." Reply Affidavit of Hogueland, 10–7–67, p. 3.

8. Reply Affidavit of Hogueland, 10–7–67, p. 3.

for it to negotiate concerning a new agreement while representation proceedings are pending before the NMB. The Clerks urge that the court is barred from determining that question because it involves matters committed by Congress exclusively to the NMB under the Railway Labor Act. Pan Am maintains on the other hand that determination of this question by the court would not impinge in any way on the functions of the Board and that the court should decide the question.

■ At the outset it is clear that, apart from the claimed bar of the Railway Act, the requirements for relief under the Declaratory Judgments Act, 28 U.S.C. § 2201, are present here. The controversy here is "definite and concrete, touching the legal relations of parties having adverse legal interests." Aetna Life Insur. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937), and cases there cited.

There is a bona fide dispute between the Clerks and Pan Am as to their respective legal rights and obligations under a statute of the United States. The parties have taken firm adverse positions with respect to the duty and obligation of Pam Am to negotiate with the Clerks Union under the unusual circumstances existing in this case. That there is nothing hypothetical about the controversy is made plain by the strike called by the Clerks Union to compel Pan Am to negotiate. Such a controversy as to legal rights and duties "is as fully determinable before as it is after one or the other party has acted in his own view of his rights and perhaps irretrievably shattered the status quo." Borchard, Declaratory Judgments (2d ed.) p. 58. See also Akron, Canton & Youngstown R. R. v. Barnes, 215 F.2d 423 (7th Cir.), and cases there cited, vacated and remanded, per curiam, "for disposition agreeable to the representation of counsel for respondents." 348 U.S. 893, 75 S. Ct. 219, 99 L.Ed. 701 (1954).

In such a situation Pan Am would not normally be required at its peril to maintain the firm legal position it has taken in good faith without the right to have the question at issue between the parties resolved by the courts. A justiciable controversy would be presented which the courts could properly resolve in a declaratory judgment suit by Pan Am.

■■ It is plain, however, that under the statutory scheme of the Railway Labor Act Congress has circumscribed the role of the courts. See generally Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); General Committee of Adjustment, etc. v. Missouri-Kansas-Texas R. Co., 320 U.S. 323, 64 S. Ct. 146, 88 L.Ed. 76 (1943). The Act commits a variety of functions exclusively to the NMB and judicial intervention which would interfere with or usurp such exclusive functions of the Board is barred. ¡See Heisler v. Parsons, 312 F.2d 172 (7th Cir. 1962).

■ The determination of disputes as to representation of employees under § 2, Ninth, is one of the important functions committed exclusively to the Board by the Act. Judicial interference with or usurpation of such functions has been held to be impermissible.

■■ Thus the action of the Board under § 2, Ninth, in determining and certifying the organization authorized to represent employees is not subject to judicial review on application of a competing labor organization. See e. g., Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S. Ct. 95, 88 L.Ed. 61 (1943) (refusal by the Court to entertain suit for cancellation of certification); U.N.A. Chapter Flight Engineers International Ass'n, AFL–CIO v. National Mediation Board, 111 U.S.App.D.C. 121, 294 F.2d 905 (1961) (no jurisdiction where rival union challenged appropriateness of bargaining unit delineated by the NMB), cert. den., 368 U.S. 956, 82 S.Ct. 394, 7 L.Ed.2d 388 (1962). Similarly a union dissatisfied with the Board's disposition of claims of employer interference raised in the course of a representation investigation

may not ordinarily obtain relief in the courts. See e. g., Ruby v. American Airlines, Inc., 323 F.2d 248 (2d Cir. 1963), cert. den., 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964); WES Chapter Flight Engineers' International Ass'n, AFL–CIO v. National Mediation Board, 114 U.S.App.D.C. 229, 314 F.2d 234 (1962). It is also clear that the courts will not compel a carrier to bargain with a plaintiff union where there is a real dispute as to which union is the representative of an employee group. See, e. g., Ruby v. American Airlines, Inc., 323 F.2d 248 (2d Cir. 1963); Flight Engineers' International Ass'n, AFL-CIO, EAL Chapter v. Eastern Airlines, Inc., 311 F.2d 745 (2d Cir.), cert. den., 373 U.S. 924, 83 S.Ct. 1523, 10 L.Ed.2d 423 (1963).

In each of these situations judicial intervention is barred because it is deemed to constitute interference with or usurpation of functions exclusively committed to the Board under § 2, Ninth, of the Act.

The case at bar does not fall within any of these lines of cases, and as far as I am aware there is no exact precedent for the situation presented here.

Although the question is a close one, as I view it the determination of the issue on which declaratory judgment is sought here does not impinge on any functions exclusively committed to the Board. Whereas most of the above-mentioned cases involved an attempt to obtain directly or indirectly judicial review of action taken by the Board in the exercise of its exclusive functions, this factor does not appear to be present in the case at bar. Nor is the carrier here attempting to have the court determine, in contravention of the statutory scheme, which of two competing representatives is the true one. Rather, Pan Am is seeking, at a time when an election is pending pursuant to § 2, Ninth, a determination of whether a given course of conduct is lawful or unlawful, under § 2, Third and Fourth. In light of the scheme of the statute as I view it the determination sought by Pan Am does not interfere with the Board's exclusive functions, but,

on the contrary, would aid in the proper exercise of such functions.

Under § 2, Ninth, of the Act it is the duty of the Board to investigate all disputes among carrier employees as to who should be their designated and authorized representative and to make such a certification. The disputes placed under the Board's jurisdiction by § 2, Ninth, are disputes "among the carrier's employees as to who are the representatives of such employees." The Board is required to act "at the request of either party"—that is to say, at the request of one of the groups of employees involved in the dispute.

Thus § 2, Ninth, contemplates the resolution by the Board of disputes between employees or employees' organizations with respect to representation. It does not deal with disputes between carriers and employees over the question of whether the carrier should or should not negotiate with the union while representation proceedings between rival organizations are pending and unresolved. There is no provision for carrier participation in the representation proceedings and I am aware of no regulation specifically providing for carrier intervention in the proceeding although on occasion a carrier has been permitted to intervene for limited purposes. See, e. g., Ruby v. American Airlines, Inc., 323 F.2d 248 (2d Cir. 1963), cert. den., 376 U.S. 913, 84 S. Ct. 658, 11 L.Ed.2d 611 (1964).

The Board is charged with securing a free and untrammeled choice of the employee representative "without interference, influence or coercion exercised by the carrier." Section 2, Ninth. From time to time the Board has investigated charges of carrier interference or coercion in connection with a representation proceeding on complaint of one or the other of the union parties to the dispute. See, e. g., In the Matter of B.R.S.C. (Alleghany Airlines) National Mediation Board Case No. 3470 (1962). But no machinery appears to have been provided for the carrier to present to the Board for definitive resolution any such question as is posed here and neither party

suggests that there is. The Board's own view of its role in this connection is indicated by the following statement quoted in Air Line Pilots Ass'n International v. National Mediation Board, 220 F.Supp. 730 (D.C., D.C.) remanded, 116 U.S.App. D.C. 300, 323 F.2d 305 (1963).

> "It has been the consistent position of the National Mediation Board since its creation under the 1934 amendment to the Railway Labor Act, that this Board has no legal authority to investigate and pass upon charges of carrier interference, assistance, influence and coercion in connection with representation of carrier employees except to take the necessary steps to see that the actual election procedure be free from such actions by the carrier." Id. at 732.

Pan Am here is refusing to negotiate with the Clerks Union at this critical moment because it seeks to avoid any taint of carrier influence or coercion which might affect the free choice of the employee representative in the election the Board is about to conduct.

This representation proceeding has now been pending for more than two years despite the directory (though not mandatory) provision of § 2, Ninth, that the Board shall make its certification "within thirty days after the receipt of the invocation of its services." The proceedings, though commenced in August of 1965, are not yet completed.

The question which the court is asked to decide here is not one committed to the Board under the Railway Labor Act and even less one on which the Board is under a duty to render a declaratory ruling. No administrative machinery is provided in the Act for the resolution of this critical question under these circumstances. If the court fails to resolve it either Pan Am is faced with a coercive strike by the Clerks Union, or if it changes its position because of pressure so exerted, it is subject to charges by the rival Teamsters of interference, influence or coercion in the election. Thus, the long overdue election result might be jeopardized or further delayed. In addition the carrier might be subject to criminal penalties under § 2, Tenth.

I see no bar to determination by the court of the question posed under well-settled declaratory judgment principles.

There is nothing in Ruby v. American Airlines, Inc., 323 F.2d 248 (2d Cir. 1963), cert. den., 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964), upon which the Clerks Union heavily relies, which would lead to a different conclusion. There, as Judge Friendly pointed out, the basic claim by the plaintiff union in seeking to restrain the carrier from negotiating with its rival was that there had been "unlawful condonation [by the Board] of illegal tactics by * * * [the carrier] * * *." Id. 323 F.2d at 254. In substance, plaintiff union was seeking to override the "Board's conclusion that no wrong had been done," Id. at 255, a conclusion reached by the Board in the performance of its duty of investigation in the representation proceedings. Plainly, as Judge Friendly held, this was an impermissible attempt to obtain a judicial review of the Board's findings on a question committed by Congress to the Board and not to the courts. The elements in the case at bar are quite different.

Moreover, the proffer of the Board, presumably under § 5, First, to mediate the immediate dispute between the Clerks Union and Pan Am, signalled by the Clerks strike call, does not furnish any bar to the granting of the declaratory relief sought. Assuming that the Board had the power under § 5, First, to undertake mediation of a dispute of this character, the mediation proceedings are designed merely to bring the parties to an agreement. In such mediation the Board performs no such adjudicative function and is not called upon to, and indeed could not make a binding determination of the question of law at issue between the parties which is the core of the dispute.

Here the Board apparently thought it had brought about a settlement of the dispute though it kept the "case" "open" on its docket, for it stated that after

meeting with the parties "normal operations have resumed pursuant to * * * [the Board's] request."[9] That there was no final or effective reconciliation of the views of the parties is made apparent by the continuing insistence of the Clerks Union in this action that the carrier is under legal obligation now to negotiate with it regarding a new contract and that it has the right to strike to compel the carrier to do so.

In Akron, Canton & Youngstown R.R. v. Barnes, 215 F.2d 423, 428 (7th Cir.), vacated and remanded, per curiam, "for disposition agreeable to the representation of counsel for respondents," 348 U.S. 893, 75 S.Ct. 219, 99 L.Ed. 701 (1954), it was held that the carrier was entitled to a declaratory judgment as to its obligations to bargain collectively with respect to limited questions after the conclusion of mediation proceedings under the Railway Labor Act.

The court said:

"We do not believe that, after the impasse, with a sharply controverted legal question as to statutory obligations remaining unsettled, either party was bound to wait until the other took physical action or until a strike or lockout was actually instituted. The courts are not powerless to adjudicate the rights of parties, where it is obvious that there is an actual controversy which can be judicially determined and to settle which will prevent multiplicity of suits and continued dissension and prevent defeat of the beneficent purposes of the Railway Labor Act."

Id. 215 F.2d at 428. Here, as there, determination of the question posed for declaratory judgment will tend to prevent the "defeat of the beneficent purposes of the Railway Labor Act."

■ I hold that the court has power to and should determine the question posed

by Pan Am's request for a declaratory judgment.

## II.

I turn then to the question on which a declaratory judgment is sought.

At the outset it should be noted that the question to be determined here is more limited than that posed by the pleadings. The question to be passed on is whether under the *particular facts and circumstances of this case* it is unlawful for Pan Am to negotiate with the Clerks Union regarding a new collective bargaining agreement. It is *not* whether negotiation by a carrier with an incumbent union while representation proceedings are pending is unlawful under any and all circumstances.

The Railway Labor Act directs that there is to be free and untrammeled choice of representatives by carrier employees without interference, influence or coercion by the carrier. § 2, Third, Fourth and Ninth, 45 U.S.C. § 152, Third, Fourth and Ninth. The Act indicates that both the carrier and the employees are to designate representatives who are to confer when disputes arise, § 2, Second, 45 U.S.C. § 152, Second, and goes on to provide:

"*Third:* Representatives, for the purposes of this Act, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. * * *

"*Fourth:* * * * No carrier, its officers, or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees * * *."

9. The Board's statement that "it is not unmindful of the litigation pending in New York," presumably means that it was well aware that a temporary restraining order was in full force and effect which barred the strike and that it expected the court to decide the issue.

\* \* \* \* \* \*

*"Ninth:* \* \* \* [In its investigation of representational disputes] the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. \* \* \* "

Railway Labor Act, § 2, Third, Fourth and Ninth, 45 U.S.C. § 152, Third, Fourth and Ninth.

Pan Am urges that to negotiate with the Clerks Union under the circumstances here would be a violation of the prohibitions of the Act against interference, influence or coercion of free employee choice of representatives. The Clerks, while apparently recognizing that the court could not compel the carrier to conduct such negotiations at this time, see Ruby v. American Airlines, Inc., 323 F.2d 248 (2d Cir. 1963), cert. den., 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964), takes the position that the carrier is free to do so without violating the statute.

■ It is well settled that under the National Labor Relations Act negotiations in parallel circumstances would be unlawful under the rules adopted by the National Labor Relations Board and enforced by the courts.

Under the NLRA, it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of \* \* \* rights" connected with the choice of collective bargaining representatives or to "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." NLRA § 8(a) (1) and (2), 29 U.S.C. § 158(a) (1) and (2). It is readily apparent that these sections are closely analogous to those on the same subject under the Railway Labor Act.

■ The NLRA provisions have been dealt with extensively by the courts and the NLRB, and the relevant general rules are clear. If an employer is presented with conflicting employee claims which raise a "real question concerning representation," the employer commits an unfair labor practice if he bargains collectively "with the incumbent (or any other) union unless and until the question concerning representation has been settled by the Board." Shea Chemical Corp., 121 N.L.R.B. 1027 (1958).[10] The Court of Appeals of this Circuit [11] and other circuits have approved this rule.[12]

■ It is plain, therefore, that the course of conduct which the Clerks Union seeks to compel Pan Am to pursue here would be an unfair labor practice and unlawful under NLRA. The cases under the NLRA are not controlling under the Railway Labor Act which is different in scheme, structure and enforcement machinery. However, they offer a cogent

10. The Board's general rule, known as the Midwest Piping Doctrine, Midwest Piping & Supply Co., Inc., 63 N.L.R.B. 1060 (1945), was temporarily modified in William D. Gibson Co., 110 N.L.R.B. 660 (1954). The *Gibson* case held that an employer does not necessarily commit an unfair labor practice if he bargains with an incumbent union. However, the *Gibson* exception to the Midwest Piping Doctrine was eliminated in Shea Chemical Corp., 121 N.L.R.B. 1027 (1958), and the doctrine was reaffirmed.

11. See, e. g., N.L.R.B. v. National Container Corp., 211 F.2d 525 (2d Cir. 1954). In *National Container Corp.* the

Second Circuit, applying the Board rules, held that an employer had interfered with the employees' organizational rights and given the incumbent union unlawful support by entering into a collective bargaining agreement following the incumbent's victory in a Board election, but at a time when the rival union's objections to the election were still pending before the National Labor Relations Board.

12. See, e. g., St. Louis Independent Packing Co. v. N.L.R.B., 291 F.2d 700 (7th Cir. 1961); N.L.R.B. v. Indianapolis Newspapers, Inc., 210 F.2d 501 (7th Cir. 1954).

analogy in the solution of similar problems arising under the Railway Labor Act and the courts have frequently drawn on NLRA cases for guidance. See, e. g., Ruby v. American Airlines, Inc., 323 F.2d 248 (2d Cir. 1963), cert. den., 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed. 2d 611 (1964); Flight Engineers' International Ass'n, AFL–CIO v. Eastern Airlines, Inc., 208 F.Supp. 182 (S.D.N.Y. 1962); American Airlines, Inc. v. Air Line Pilots Ass'n, International, 169 F. Supp. 777 (S.D.N.Y.1958).

Thus, while I am aware of no cases under the Railway Labor Act dealing with the question now before us, considerable weight must be given to the NLRA cases dealing with the parallel situation. Moreover, the rule of employer neutrality set forth in these cases appears even more relevant when the policies and scheme. of the Railway Labor Act and the practical consequences of a contrary view in the circumstances in this case are considered.

The freedom guaranteed to carrier employees to select their representatives without interference, influence or coercion by the carrier, is a salient feature of the Railway Labor Act. Prior to the statute the railway industry had a history of company dominated unions.[13]

 A principal purpose of the Railway Labor Act was the promotion of peaceful settlement of labor disputes in the transportation industry so vital to the national welfare. See § 2(1)–(5), 45 U.S.C. § 151a. The Act's prohibitions against carrier interference in the selection of employee representatives, strengthened by the 1934 amendments, were deemed essential to the realization of this purpose and to the proper functioning of the machinery of the statute. These prohibitions were implemented by the provisions of § 2, Tenth, imposing substantial criminal penalties for wilful violation by the carrier of the anti-interference provisions of § 2.[14]

There were sound reasons for placing these prohibitions in the statute in order to insure a free choice of employee representatives and the integrity of the selection process. It is clear as a matter of common sense that it is not only the more blatant and wilful forms of carrier misconduct such as threats of reprisal or discriminatory discharges that will interfere with free selection of employee representatives.

Any conduct on the part of the carrier, however motivated, which tends to enhance or detract from the prestige of one of the competing organizations may constitute "influence" if not "interference" or "coercion." It can scarcely be supposed that employees who are soon to cast a representation ballot will not give considerable weight to the fact that the carrier is currently bargaining with one of the rival unions; the probabilities of this fact "influencing" the result are great. In fact, any conduct which departs from a standard of strict carrier neutrality is suspect. Moreover, the opportunities afforded the carrier for exercising influence on the election by the manner in which it conducts negotiations are plain and need not be spelled out.

Such dangers are particularly apparent in the circumstances of the case at bar.

Here representation proceedings between the two competing unions have been pending before the Board for well over two years and it appears that the dispute is on the verge of final resolution in a third election. The proceedings have been protracted and bitter, involving charges and counter charges, extensive investigations by the Board, the setting aside of two successive elections and the ordering of a third. Attempts by the Clerks Union to secure court intervention in the dispute after the first election

---

13. See Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 545, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

14. In fact these criminal sanctions are rarely invoked. See Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 126 (1964).

was set aside have been rejected by the District Court and the Court of Appeals of the District of Columbia [15] as unwarranted judicial interference with the Board's representation functions.

At this late stage of the proceedings and after a new election has been ordered, the Clerks Union has renewed its demand upon Pan Am that it negotiate concerning a new contract and has sought to enforce that demand by a strike call. Whatever other motives may exist for taking this position, it is plain that the Clerks Union seeks to gain a substantial advantage in the contest over representation by compelling Pan Am to carry on negotiations with it at this time.[16]

There are undoubtedly some disadvantages to the employees which may result from the carrier's failure to bargain during the course of representation proceedings. Benefits which might otherwise be secured in a new contract may be delayed.[17] In the contemplation of the Act such delays should be minimal since the Act directs the Board to certify a representative within 30 days of the invocation of its services. Section 2, Ninth, 45 U.S. C. § 152, Ninth. But even taking into account the extended delay in this case to which both of the rival unions seem to have contributed, any disadvantages from the temporary halt in bargaining (which can be remedied in part at least by retroactive provisions in any contract negotiated by the newly designated representative) are far outweighed by the necessity for insuring free choice of the representative uninfluenced by the carrier in accordance with the declared policy of the Act.

 I hold, therefore, that Pan Am is entitled to a judgment declaring that under the facts and circumstances of this case, it is a violation of the Railway Labor Act for Pan Am to conduct negotiations with the Clerks Union until the final resolution by the NMB of the pending representation proceedings.

### III.

There remains the question of whether Pan Am is entitled to injunctive relief against the strike called by the Clerks Union to compel negotiation in violation of the Railway Labor Act.

 It is well settled that injunctive relief may be granted to vindicate the processes of the Act regardless of the provisions of the Norris-LaGuardia Act. 29 U.S.C. §§ 101–115. See, e. g. Brotherhood of RR. Trainmen v. Chicago River & Ind. R. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Virginian Ry. v. System Federation No. 40, 300 U. S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777 (S.D.N.Y.1958). Thus, parties to a major dispute, while free to resort to a strike following the exhaustion of the mandatory processes of the Act, see American Airlines, Inc. v.

---

15. See Brotherhood of Railway & Steamship Clerks etc. v. National Mediation Board, 374 F.2d 269 (D.C.Cir.1966).

16. The Clerks Union urges that Pan Am has a permissive right to negotiate with it, citing Ruby v. American Airlines, Inc., discussed supra, at 19 & 20. That case clearly does not support the defendants' position. In Ruby the court found that the carrier, who, prior to the Board election, dealt with a new union rather than with the old collective bargaining agent, did not necessarily violate the Act since the new union had presented to the carrier "substantial evidence that * * * [it] * * * represented an overwhelming proportion of its pilots." Ruby v. American Airlines, Inc., 323 F. 2d 248, at 254 (2d Cir. 1963), cert. den.,

376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964). Even in these circumstances the court in Ruby declared that the employer, in recognizing the new union, acted "at peril of being right." Ibid. The Clerks Union has not made the showing of overwhelming support that was deemed decisive in Ruby and the Board has found that the Teamsters have produced the necessary authorizations from more than 50% of the employee group required to institute the representation proceeding.

17. It may be noted that despite the delay in bargaining Pan Am has given a 5% wage increase to its clerical employees to bring them in line with similar raises granted in new contracts made with other employee groups.

Air Line Pilots Ass'n, 169 F.Supp. 777 (S.D.N.Y.1958); Elgin, J. & E. R. R. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed 1886 (1945), may be enjoined from striking prior to the exhaustion of such processes. See American Airlines, Inc. v. Air Line Pilots Ass'n, supra. Although "agreement is not compulsory the steps required by the Act are." American Airlines, Inc. v. Air Pilots Ass'n, supra, 169 F.Supp. at 787. Where the unresolved dispute is a minor one, submission to the National Railroad Adjustment Board is, in effect, compulsory and a strike over disputes which that Board is required under the Act to determine may be enjoined. See Brotherhood of RR. Trainmen v. Chicago River & Ind. R. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

Proceedings before the Board under § 2, Ninth, of the Act to determine the authorized representatives of carrier employees are as important in the scheme of the Act as those providing for mediation of major disputes and adjustment of minor disputes.

Injunctive relief also may be granted in appropriate circumstances to vindicate the vital representation process. See Virginian Ry. Co. v. System Federation, No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). See also Brotherhood of RR. Trainmen v. Chicago River & Ind. R. R. Co., supra, 353 U.S. at p. 41, 77 S.Ct. 635, 1 L.Ed.2d 622.

In the case at bar the strike was called by the Clerks Union to compel the carrier to take action which, I have held, would constitute unlawful interference in the representation proceedings pending before the NMB. Were the strike successful in its objective it might well frustrate the functions of the Board in determining the free choice of the clerical and related employees of Pan Am as to their authorized representative and contravene the provisions of the Act which require the Board to make such a determination free from carrier "interference, influence or coercion."

The question is whether or not at this time and under these circumstances the union may lawfully resort to self-help by way of a strike which would frustrate the orderly carrying out of the representation process. I hold that it may not and that an injunction may properly issue and is required restraining a strike of the Clerks Union at this stage of the representation proceedings to prevent "a plain violation of a basic command of the Railway Labor Act 'adopted as a part of a pattern of labor legislation.'" Order of RR. Telegraphers v. Chicago & N. W. Ry. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) (citations omitted).

In the light of the history of the lengthy proceedings before the Board now apparently on the verge of final resolution and the manifest public interest involved, it is too plain for discussion that irreparable injury would result were such injunctive relief not granted and that there is no adequate remedy at law.

An injunction will issue restraining the defendant Clerks Union and its officers and representatives named as defendants from causing, calling or engaging in any strike or concerted work stoppage against Pan Am for the purpose of compelling Pan Am to negotiate with the defendant Clerks Union with respect to a new contract on behalf of clerical and related employees while the representation proceedings are pending and unresolved before the National Mediation Board.

A decree will be settled on notice providing for both the declaratory and injunctive relief granted to plaintiff. Pending the settlement of such decree the provisions of the temporary restraining order issued by this court on September 19, 1967, and extended by stipulation of the parties to midnight of November 9, 1967, shall remain in full force and effect.

The foregoing constitutes my findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

It is so ordered.