**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Appellant,**

v.

**BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, etc., Appellees.**

**NATIONAL MEDIATION BOARD et al., Appellants,**

v.

**BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, etc., Appellees.**

Nos. 21620, 21622, 21623.

United States Court of Appeals
District of Columbia Circuit.

Argued April 16, 1968.

Decided June 28, 1968.

Certiorari Denied Oct. 14, 1968.

See 89 S.Ct. 135.

Mr. Herbert S. Thatcher, Washington, D. C., with whom Mr. David Previant, Milwaukee, Wis., was on the brief, for appellant in No. 21,620. Mr. Donald M. Murtha, Washington, D. C., also entered an appearance for appellant in No. 21,620.

Mr. John C. Eldridge, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., was on the brief, for appellants in Nos. 21,622 and 21,623.

Mr. James L. Highsaw, Jr., Washington, D. C., with whom Mr. Edward J. Hickey, Jr., Washington, D. C., was on the brief, for appellees.

Before BURGER, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

In these consolidated actions the National Mediation Board (Board) and the Teamsters[1] appeal a District Court order granting a preliminary injunction restraining the Board from holding representation elections among clerical and office employees of Pan American and Braniff Airways. The Railway Clerks (Clerks),[2] presently certified by the Board as bargaining representative of both groups of employees, sought the injunctions, alleging that the Board had violated its statutory duties in scheduling a third election rather than dismissing the Teamsters' petition on the basis of the second election. The Clerks also contend that the Board in any event had no statutory authority to compel the Clerks to appear on the election ballot or forswear further representation of the employees.[3]

The District Judge denying the Board's cross-motion to dismiss the complaint, found the threatened harm irreparable and the questions substantial, and he therefore held that there was jurisdiction to issue a preliminary injunction. We reverse. The complaint should have been dismissed.[4] Given the broad power vested in the Board under the doctrine of Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed.

---

1. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees.

3. The Clerks also claim they were denied due process by the Board's scheduling investigations of both disputes at the same time, so that their chosen representative could not be present at both. The Railway Labor Act, however, places great emphasis on speedy resolution of representation disputes. "Since the requirements of due process frequently vary with the type of proceeding involved," Hannah v. Larche, 363 U.S. 420, 440, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), we do not find the Constitutional claims meritorious.

4. Where a preliminary injunction has been granted, and that order is appealed, we may properly review the denial of the motion to dismiss the complaint, although that ruling would not otherwise be appealable. Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940); FTC v. Cinderella Career and Finishing School. —— U.S. App.D.C. ——, 404 F.2d 1308 (1968).

61 (1943), the actions here do not justify judicial intervention.

We set forth the background of the controversy and begin with the observation that this is one of those cases requiring a lot of reference to the merits in order to make clear that there is no room for exercise of judicial power. This court was concerned with an earlier phase of the Pan American dispute in Brotherhood of Railway and Steamship Clerks etc. v. NMB, 126 U.S.App.D.C. 55, 374 F.2d 269 (1966). Briefly, in 1965, the Teamsters filed an application with the Board pursuant to section 2, Ninth of the Railway Labor Act,[5] requesting Board investigation of a representation dispute among Pan American's clerical employees. The Teamsters Union claimed majority support, entitling it to certification as employee representative instead of the Clerks. The Board held a mail ballot election in August of 1966, but the ballots were impounded before they were counted. Letters had been sent to the employees over the forged signatures of George Meany and C. L. Dennis, President of the Clerks, stating that the Clerks' name had been erroneously omitted from the ballot, and that a write-in campaign was being conducted on their behalf. This was a lie. The Clerks were off the ballot intentionally because under Board practice a new union would be certified only if more than 50% of the employees in the unit actually voted in the election for some collective representation. Given that some employees would not bother to vote in any event, the incumbent union had a strategic advantage by telling its employees not to vote, because that way a challenger had to poll an absolute majority. In other words, if the incumbent's (non-voting) supporters, plus employees indifferent to or against collective representation, totalled more than 50% of the employees in the unit, then the challenging union's petition would be dismissed. According to the Clerks, that would leave the status quo ante in effect between the carrier and the still certified Clerks. That tactic would backfire, however, had write-in votes for the incumbent pushed the total employee participation in the election over the 50% mark.[6]

The Board in October 1966 set aside the election and directed that another mail ballot election be held in November 1966. The Clerks protested that this was too soon after the mailing of the forged letters to permit the fraud to be fully attenuated. After the Board rejected this contention, the Clerks sued to enjoin the election. The District Court held that there was no judicial power to interfere, but doubts were expressed on the wisdom of such a hasty second campaign. This court denied a stay of the election pending appeal, concluding that "although the record does suggest that the Board has not been sufficiently concerned to scrape away all stain of the fraud, we hesitate to conclude that the Board's action was so gross as to invest the court with jurisdiction."[7]

After this court's decision issued in late December 1966, the Board began counting the ballots, which had been mailed to the employees in November and had been returned in early December.

---

5. 45 U.S.C. § 152, Ninth.

6. The Board treats all non-voters as desiring no representation, and in effect, voting for that by refraining from casting a ballot in the election. The Board does not permit votes against representation except in that manner. That is, a write-in ballot for "no union" is an invalid ballot. The voter's preference is effectuated anyway by the Board's treating that "vote" as not having been cast, and therefore indicative of disapproval of representation.

The Board does not provide on its ballot for any means by which the voters may express secondary preferences. It is presumed that all favoring representation by some union will prefer representation by any union to going unrepresented.

7. Brotherhood of Railway and Steamship Clerks v. NMB, *supra*, 126 U.S.App.D.C. at 59, 374 F.2d at 273.

The vote was close. There were at this time 6936 employees in the unit. The Teamsters received 3091 votes. There were 137 write-ins for the Clerks, and 284 write-ins for the Transport Workers Union. If all ballots were valid, they would account for a majority of the employees, and satisfy the condition necessary for a vote to be of sufficient size to permit replacement of the existing representative. Since the Teamsters had a majority of the votes, that union would have been entitled to certification under the Board's practice.

Both the Clerks and the Teamsters appealed to the Board certain rulings made by the Mediator in counting the ballots. Only the Clerks' objections are relevant here. The Clerks challenged 1178 ballots counted by the Mediator. The 137 write-in votes for the Clerks were claimed to be invalid as being the product of the forged letter, for which the Clerks felt the Teamsters were responsible.[8] The 284 write-in votes for the Transport Workers were allegedly invalid because the Transport Workers, pursuant to an inter-union no-raiding agreement, could not represent these employees.[9] Some 754 ballots for the Teamsters were contested because they were taken from unpostmarked envelopes, and allegedly the ballots had been removed from Post Office custody for two weeks contrary to election ground rules.[10]

The Board did not rule on any of these contentions. Rather on September 12, 1967, it issued an opinion stating in part:

"The Board has carefully reviewed each of these points raised by the respective organizations and finds that no useful purpose would be served by an item by item discussion of the merits of these objections. It is our view that several of these objections are peripheral and without merit, but in reaching our determination, it is incumbent upon us to inspect the whole congeries of facts alleged and incidents complained of concerning the course of the second election and make an assessment based thereon."

The opinion went on to note statements by this court and the District Court expressing doubts that the short time between elections was sufficient to remove all possibility that the forged letters might affect the second election. The Board then stated that it too was disturbed that the election results might not reflect "the free and clear choice of the employees affected."

The second election was therefore set aside and a third election ordered. This made it unnecessary to rule on any of the objections. Moreover, the Board also recited that much of the confusion that had delayed this case was attributable to the Clerks' absence from the ballot, as they in fact had hopes of continuing to

---

**8.** The forged letters urged the employees to write-in "Brotherhood of Railway Clerks," or "BRC." These designations were used on the majority of the 137 write-in ballots. From that, the Clerks argue that these employees were influenced by the forged letters.

The Board points out, however, that regardless of whether the ballots were induced by the fraudulent letters, the employees who cast them thereby evinced a desire for representation. On the theory, see note 6 *supra*, that they would prefer representation by the Teamsters to going unrepresented, the Board might properly have counted those ballots towards the 50% participation required for a valid election.

**9.** The Transport Workers had been involved in a representation dispute concerning these employees, but pursuant to an arbitration award they had been held foreclosed from challenging the Clerks. The Clerks contend that as the Transport Workers can not validly represent the employees, the Board must treat as invalid the votes for that union.

Again the Board responds that the only purpose for which the votes are being used is to show that more than 50% of the employees wish representation of some sort.

**10.** The envelopes were sent under a Government frank. Post Office regulations require that all mail be postmarked, regardless of whether so franked, but the Board contends that this rule is frequently broken, particularly when the mailing is in the Christmas season.

represent these employees. In granting the Clerks permission to stay off, said the Board, it had failed to adhere to its long-standing and consistently applied policy. Therefore in the third election, the Clerks were either to go on the ballot or forswear future representation.

This same policy was applied to· the Braniff dispute, also before us, a representation dispute that had recently been filed. There too the Board ordered the Clerks to appear on the ballot or relinquish representation rights. This Braniff election, and the third Pan American election, were preliminarily enjoined by the District Court in these proceedings.

## I

■ On appeal, the Clerks argue that the rules of the Board and its prior practice require it to resolve their challenges to the ballots and to dismiss the Teamsters' petition should any of these challenges be accepted.[11] We reject this contention without tarrying to consider the finer points of the scope of judicial review, or non-review, of Board determinations. The Railway Labor Act places on the Board the duty to "investigate" representation disputes and to ascertain, by ballot or by other appropriate means, the wishes of the employees as to who shall represent them. Where obvious reasons are present for doubting whether an election accurately reflects employee wishes, the Board's decision to hold another election is an eminently reasonable exercise of its powers. Moreover we note that the ballots in the second election had already been received by the Board prior to issuance of the judicial opinions, issued in the very action the

Clerks brought, questioning the wisdom of the Board's decision to hold an immediate second election. The Board can hardly be faulted for deciding to try again, particularly when the results were so close.

## II

More substantial problems are raised by the Clerks' contention that the Board had no power to order the Clerks to appear on the ballot or give up any further representation of the employees. For the Clerks this is the key ruling, for if implemented they lose the tactical advantages the incumbent heretofore enjoyed.[12] The essence of the Clerks' contention is that the Board has no power whatever to decertify a union; all it may do is certify some new representative. Unlike the National Labor Relations Act, the Railway Labor Act has no decertification provisions. Thus, the Clerks argue, if the Board holds an election in which fewer than 50% of the employees vote, under the present rules no certificate can issue to the Teamsters. The absence of a decertification provision in the statute means, it is contended that any questions of the continuing vitality of the old certificate are questions for the courts that will arise should the carrier refuse to negotiate or should employees challenge the continuing representation by a union. Meanwhile the carrier at least may (and perhaps must) deal with the representative that has been certified and never decertified, the Clerks.

■■ There is an anomaly in trying to throw these questions to the courts *ab initio* when the law generally stresses Board discretion in these matters to the

---

11. The Clerks also contend that the authorization cards used to start the dispute in the Pan American case are no longer valid to sustain it, because there has been substantial personnel turnover, as well as increase in the size of the unit. The Board, under its rules, treats the old cards as continuing the dispute. We find no basis for saying this procedure is outside the Board's statutory power.

12. The Clerks claim they are irreparably injured in the Pan American dispute because in the past two elections. they have been urging their supporters n'ot to vote. Allegedly, it will be impossible to shift gears abruptly if they are on the ballot. We doubt the substance of the claim, particularly as the last election was in December 1966. In any event, it does not rise to constitutional dimension, and other than that the Act leaves such matters to the judgment of the Board.

exclusion of all other considerations. In any event, the Clerks' argument does not and cannot vault over the hurdle erected by the Supreme Court's decision in Brotherhood of Railway and Steamship Clerks etc. v. Association for Benefit of Non-Contract Employees, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965). There the Supreme Court indicated that employees under the Railway Labor Act were to have the option of rejecting collective representation entirely. The decision precludes a ruling that the Board's sole power is to certify someone or group as an employee representative, imposing on the carrier a duty to treat with that representative. We think that the Board has the power to certify to the carrier that a particular group of employees has no representative to carry on the negotiations contemplated by the Railway Labor Act, thereby relegating the carrier and its employees to employment relationships and contracts not presently governed by the Railway Labor Act.

In Railway Clerks v. Association, *supra*, the Court held erroneous the issuance of an injunction to prohibit the Board "from conducting an election with a ballot that did not permit an employee to cast a ballot against collective representation." 380 U.S. at 668, 85 S.Ct. at 1202. The Court held that the Board had broad statutory authority to select procedures and ballots for determining employee representatives. The failure to provide a "no-union" box on the ballot did not exceed this authority. In so holding, however, the Court stated that "the legislative history supports the view that the employees are to have the option of rejecting collective representation." 380 U.S. at 669 n. 5, 85 S.Ct. at 1202. It went on to note that the Board's present practice of treating non-voters as voting against representation did in fact give employees who wished no collective representation a chance to be heard. We

need not occupy ourselves with the question whether the statement upholding an employee right to reject collective representation is technically ratio decidendi or dictum. The statement was plainly carefully considered, in view of the nature of the dissent, which pointed out that the Board had been interpreting the Act as strongly favoring collective representation.

It is true, as the Clerks point out, that that case involved an attempt to unionize employees not then collectively represented, rather than, as here, an attempt by one union to dislodge another. We agree with counsel for the Board, however, that it is inconceivable that the right to reject collective representation vanishes entirely if the employees of a unit once choose collective representation. On its face that is a most unlikely rule, especially taking into account the inevitability of substantial turnover of personnel within the unit.

■ The right of employees to reject collective representation, recognized in Railway Clerks v. Association, yields as a corollary the Board's implied power to certify to the carrier that in a particular unit the employees have in fact rejected such representation. In effect, the Board's present direction to the Clerks means that unless they are willing to give up their status as authorized representative, they will be put on the ballot, like it or not, and further, that should they be on the ballot and fewer than one-half of the employees vote, the Board intends to certify to the carrier that these employees have no representative for purposes of the Act. The Board has in the past refused to certify a representative, when an election among unorganized employees failed to elicit the votes of 50% of the employees, without any hue and cry that employees must be represented so that the negotiations contemplated by the Act may go on.[13] The Board may not

13. The parties have not alerted us to any authorities on the question, and we need not consider at this juncture, whether or in what circumstances a carrier under

no Railway Labor Act duty to treat with representatives of the employees because none are authorized, could lawfully deal with a non-certified labor organization

only decline to certify a representative, but may go further and certify that there is no representative.

### III

■ Although we find the Board has statutory power to adopt the on-the-ballot policy outlined, we confess considerable uneasiness whether the Board has, with attention to the possible ramifications, evolved a general policy which it intends to apply in all further representation disputes.

This on-the-ballot policy originated in the order of September 12, 1967, in the Pan American case. It was subsequently applied to the Braniff dispute. The Clerks raise questions concerning the way the Board in September justified its order to the Clerks, to get on the ballot or out of the picture, as adherence to "a consistent policy in representation matters to the effect that where an incumbent union was challenged by a petitioner under Section 2, Ninth, it must, if a proper representation dispute existed, participate in any election." The Board referred to Railway Clerks v. Association, but only as reinforcing the correctness of the past policy. Urging reconsideration by the Board, the Clerks pointed out that the alleged "consistent policy" was not only unsupported by the cases cited in the Board's opinion, but that in at least 16 reported cases between 1940 and 1967 (three of them involving the Clerks) an incumbent union was permitted to stay off the ballot without application of any such policy.

In October 1967, the Board issued a finding and an order on reconsideration, in both the Pan American and Braniff disputes. This opinion adhered to the on-the-ballot ruling announced in September, "without contesting or conceding" the accuracy of the Clerks' chal-lenge. The Board again relied heavily on the confusion that might have existed in the first two elections from the failure of the employees to see the Clerks on the ballot. However, the Board also stressed that it had "little discretion to adopt any other course" in light of the Supreme Court's statements in Railway Clerks v. Association, *supra,* which the Board read as mandating that non-voters be counted against collective representation in order to effectuate the employee right to reject all representation.

We find unsettling the Board's reliance on the confusion caused by the Clerks' failure to appear on the ballot in the Pan American case. That confusion was fostered by the two forged letters. Although the perpetrators of that forgery have not been apprehended, it would seem unfair, given the unlikelihood that the Clerks were responsible, to say that the reprehensible acts of other persons require that the Clerks be deprived of the same advantage the Board would permit in the case of other incumbent unions.

Likewise unsettling is the Board's apparent view that the Supreme Court gives it no choice but to continue its present ballot, with an on-the-ballot policy. As we have already said, we think the ruling in Railway Clerks v. Association does authorize the Board to fashion such a requirement. But that decision stressed the Board's broad power to control balloting, and there are other ballots that might be used to effectuate an employee right to reject collective representation. Different balloting procedures might have different impacts on the stability of representation.[14] We note that the Board in order to realize stability of representation,[15] does not utilize the presumption, used by the National Labor Relations Board, that non-voters concur in the wishes of the majority of voters,

concerning matters that are normally required subjects of negotiation between authorized management and employee representatives. Compare, where there is an unresolved dispute as to who is the employee representative, Pan American World Airways, Inc. v. Int'l Brh'd of Teamsters, 275 F.Supp. 986 (S.D. N.Y.1967).

14. For example, the Board might change its old policy and add a "no union" box to the ballot.

15. NMB Case No. R-1818, decided June 30, 1948.

thereby permitting certification regardless of whether a majority of employees participate in the election.[16]

█ The choice of what policy to follow is essentially for the Board to make. It is, however, for that very reason disturbing that on the one hand the courts refuse to involve themselves deeply in the substance of these questions, emphasizing the nearly unlimited powers of the Board, while on the other, the Board is heard to protest that its answers are mandated by the need for application of dictum in judicial opinion. This Alphonse-Gaston interplay is disquieting, with all due allowance for the possibility that the Board has given full consideration to the considerable problems, and uses court precedent as a palliative against pressures rather than as a prime mover of Board action.

Board counsel assures us that the Board's policy is one for all seasons. But just as appellate counsel may not shore up an agency decision by constructing after the fact his own eminently reasonable foundation for it,[17] so too there are limits to the repair carpentry that may be accomplished by representations of agency intentions left unclear by the record.

While the Board's position is not stated as clearly as we would like, or might require if its orders came within the customary framework of court review of administrative action, we do find some reassurance (although the Clerks obviously do not) in the Board's application of this on-the-ballot policy to the Braniff dispute. In Braniff the elections have not been confused and rendered atypical by forgery, auguring that the Board intends its standard to be generally applied. Moreover, the facts of the Pan American dispute were well suited to driving home the Alice-in-Wonderland quality of any election where one of the major disputants stays off the ballot, surviving only by inducing the electorate not to participate in the election process. We take the matter then as one where the Board has stated, and intends, its ruling as a policy of general application, and need not consider the question that would arise if its actions revealed, beyond power of honest contradiction, that the Clerks were being treated differently from others.

The nub of the matter is this: The courts must put aside the kinds of disquietude that we have sketched in deference to the doctrine of *Switchmen's Union* that the courts have no jurisdiction to intervene in representation disputes committed by the Railway Labor Act to final Board action.[18] The Act puts a premium on speed of resolution; indeed, the Board is directed to resolve representation disputes within 30 days.

16. The Attorney General supported, 40 Ops.Att'y Gen. 541 (1947), the NMB's power to certify an authorized employee representative even though a majority of the employees did not participate in the election, relying on Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). There the Court upheld the use of a presumption that non-voters concur in the wishes of the majority of voters. That case might be distinguished because a majority of the employees in the unit did participate, and the Court noted that fact. However, the Court's reliance in *Virginian Ry.* on an analogy to political elections served to support NLRB power to certify a union even where a majority of the unit did not participate in the election, e.g., NLRB v. Standard Lime & Stone Co., 149 F.2d 435 (4th Cir.), cert. denied, 326 U.S. 723, 66 S.Ct. 28, 90 L. Ed. 429 (1945).

17. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L. Ed.2d 207 (1962); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967).

18. Brotherhood of Railway and Steamship Clerks v. Association for Benefit of Non-Contract Employees, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965). In this court see, e.g., UNA Chapter, Flight Engineers Int'l Ass'n v. NMB, 111 U.S.App.D.C. 121, 294 F.2d 905 (1961), cert. denied 368 U.S. 956, 82 S.Ct. 394, 7 L.Ed.2d 388 (1962); WES Chapter, Flight Engineers Int'l Ass'n AFL–CIO v. NMB, 114 U.S.App.D.C. 229, 314 F.2d 234 (1962).

In Switchmen's Union v. NMB, *supra*, 320 U.S. at 305, 64 S.Ct. 95, 88 L.Ed. 61, the Court wrote that "The intent seems plain—the dispute was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law."

 That purpose may be fulfilled only if the courts are extremely chary of involving themselves. The narrow exceptions to the "jurisdictional" bar created by Leedom v. Kyne,[19] and similar cases must be instances of constitutional dimension or gross violation of the statute. The exception inevitably eliminates any strict concept of lack of jurisdiction, since it permits a peek at the merits. The reconciliation of doctrine lies not in concepts but in practicalities. The retention of the doctrine negativing jurisdiction to consider the merits serves to confine the assertion of jurisdiction to cases where the error on the merits is as obvious on the face of the papers as the violation of specific statutory language, without extension to "arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide."[20] As this court has written, the Board's action must be "so plainly beyond the bounds of the Act, or * * * so clearly in defiance of it, as to warrant the immediate intervention of an equity court."[21] This case does not bring us to such a pass.

Reversed and remanded.

TAMM, J., concurs in the result reached and the action taken in the above opinion insofar as it reverses the District Court's actions and authorizes the National Mediation Board to schedule the third election discussed in the opinion.

19. 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). See Railway Clerks v. Association, *supra*, 380 U.S. at 660, 85 S.Ct. at 1197: "The limited nature of this holding [Leedom v. Kyne] was re-emphasized only last Term where we referred to the 'narrow limits' and 'painstakingly delineated procedural boundaries of *Kyne*.' Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 899, 11 L.Ed.2d 849 (1964)." However, there was no indication in Railway Clerks v. Association that Leedom v. Kyne was reserved for cases arising under the National Labor Relations Act. It is generally assumed that *Leedom* does apply to matters arising under the Railway Labor Act.

20. That cautionary language was used in the Railway Clerks v. Association, *supra*, 380 U.S. at 671, 85 S.Ct. at 1203.

21. Local 130, Int'l Union of Elec., Radio & Machine Workers v. McCulloch, 120 U.S.App.D.C. 196, 201, 345 F.2d 90, 95 (1965).